**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

v.

TIMOTHY YAZZIE,
*Defendant-Appellant*.

No. 12-10165

D.C. No.
3:11-cr-08086-
NVW-1

Appeal from the United States District Court
for the District of Arizona
Neil V. Wake, District Judge, Presiding

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

v.

SHONNIE SHIDALE GEORGE, AKA
Shonnie George,
*Defendant-Appellant*.

No. 12-10326

D.C.
No. 3:11-cr-
08082-GMS-1

OPINION

Appeal from the United States District Court
for the District of Arizona
G. Murray Snow, District Judge, Presiding

Argued and Submitted
November 5, 2013—San Francisco, California

Filed February 27, 2014

Before: Jerome Farris, Ferdinand F. Fernandez,
and Sandra S. Ikuta, Circuit Judges.

Opinion by Judge Ikuta

**SUMMARY**[*]

**Criminal Law**

Affirming two defendants' convictions for aggravated sexual abuse of a minor, the panel held that the district court did not violate the defendants' Sixth Amendment rights to a public trial when it closed the courtroom while the child victims were testifying.

The panel also held that the closure of Yazzie's trial did not violate the requirements of 18 U.S.C. § 3509(e), which permits a closed courtroom during the testimony of a child witness.

The panel concluded that Yazzie's multiple convictions under 18 U.S.C. § 2241(c) for discrete sexual acts that occurred during one sexual encounter with the victim do not violate the Double Jeopardy Clause.

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

**COUNSEL**

Michael J. Bresnehan, Law Offices of Michael J. Bresnehan, Tempe, Arizona, for Defendant-Appellant Timothy Yazzie, 12-10165.

Keith J. Hilzendeger (argued), Research and Writing Specialist; Jon M. Sands, Federal Public Defender, Office of the Federal Public Defender, Phoenix, Arizona, for Defendant-Appellant Shonnie Shidale George, 12-10326.

Karla Hotis Delord (argued), Assistant United States Attorney; John S. Leonardo, United States Attorney; Mark S. Kokanovich, Deputy Appellate Chief, United States Attorneys' Office, Phoenix, Arizona, for Plaintiff-Appellee United States of America, 12-10165.

Cassie Bray Woo (argued), Assistant United States Attorney; John S. Leonardo, United States Attorney; Mark S. Kokanovich, Deputy Appellate Chief, United States Attorneys' Office, Phoenix, Arizona, for Plaintiff-Appellee United States of America, 12-10326.

---

**OPINION**

IKUTA, Circuit Judge:

In this consolidated opinion we consider claims by Shonnie Shidale George and Timothy Yazzie, both of whom were on trial for sexual abuse with children, that their Sixth Amendment rights to a public trial were violated when the district court closed the courtroom while the child victims were testifying. We have jurisdiction pursuant to 28 U.S.C.

§ 1291 and affirm the district court. Applying the test set out in *Waller v. Georgia*, 467 U.S. 39 (1984), we conclude the closures did not violate the defendants' constitutional rights. We also conclude that the closure at Yazzie's trial did not violate the statutory provision permitting a closed courtroom during the testimony of a child witness, *see* 18 U.S.C. § 3509(e). Finally, we conclude that Yazzie's multiple convictions under 18 U.S.C. § 2241(c) for discrete sexual acts that occurred during one sexual encounter with the victim do not violate the Double Jeopardy Clause.[1]

I

A

George lived on the Navajo reservation in Arizona at the home of his aunt, Mrs. Pauline Mann. Several of Mrs. Mann's grandchildren (George's younger cousins) also lived on the Mann property or within walking distance. George's alleged victims were his four younger cousins: John Doe S.A. (age six), Jane Doe N.T. (age five), Jane Doe S.A. (age four), and Jane Doe O.A. (age eight).

In June 2007, Mrs. Mann's stepson Cody Thomas heard a "scream, like a cry" coming from the outhouse on the property. Thomas opened the door and saw George's six-year-old cousin, John Doe S.A., "bent over the toilet seat with [George] behind him." Both George and John Doe S.A. had their pants pulled down. According to John Doe S.A., George penetrated him anally. John Doe S.A.'s mother called the police and took her son for a medical examination, but

---

[1] In a separately filed unpublished disposition we address Yazzie's remaining arguments.

apparently no additional investigation of the incident was completed until three years later when George again molested two of his younger relatives.

On December 3, 2010, George's younger cousins Jane Doe S.A. and Jane Doe N.T., then 4 and 5 years old, were playing beside a parked car on Mrs. Mann's property. George pulled down his and the children's pants, had them bend over, and penetrated each of them beside the car. Although George instructed the children not to tell anyone what had happened, Jane Doe N.T. told her mother shortly thereafter and received medical treatment for a urinary tract infection. Because the medical examination revealed evidence of sexual assault, Jane Doe N.T. also underwent a forensic examination. Medical personnel contacted the police. All four children were interviewed at the Flagstaff Medical Center Child Safe Center in December 2010.[2]

The United States indicted George in the District of Arizona on April 12, 2011 on five counts of sexual abuse, pursuant to 18 U.S.C. § 2241(c), and two counts of abusive sexual contact, pursuant to 18 U.S.C. § 2244(a). Five of the counts contained in the indictment involved the 2007 incident in the outhouse and the 2010 incident beside the parked car.

Prior to trial, the government moved to close the courtroom during each child's testimony, pursuant to

---

[2] Because George was not convicted of the charges involving Jane Doe O.A., we do not discuss the allegations underlying those charges.

18 U.S.C. § 3509(e).[3]  The government argued that closure was necessary to avoid intimidating the children, which might result in incomplete testimony or preclude their testimony altogether.  The government noted that the children were young (one child was five, another was six) and the ten-year-old boy was mentally slow.  The children would be called upon to testify about difficult and traumatic events.  Family members for both the victims and defendant might attend the trial, which could cause the victims to experience shyness, shame, and embarrassment.  Further, the victims might be intimidated by the large courtroom, strange faces on a jury, a judge who sits above them, and attorneys asking them intimate questions.  The government argued that closure was the "least restrictive method of child witness protection" available, because alternatives such as a two-way closed circuit television or videotaped depositions require closer judicial scrutiny, *see* 18 U.S.C. § 3509(b).  The government submitted the videotaped forensic interviews of the children at the Flagstaff Medical Center Child Safe Center for the court's review.

---

[3] Section 3509(e) provides:

> **Closing the courtroom.**—When a child testifies the court may order the exclusion from the courtroom of all persons, including members of the press, who do not have a direct interest in the case. Such an order may be made if the court determines on the record that requiring the child to testify in open court would cause substantial psychological harm to the child or would result in the child's inability to effectively communicate. Such an order shall be narrowly tailored to serve the Government's specific compelling interest.

George opposed the motion and requested an evidentiary hearing. In his opposition, George stated that his primary concern was the closure's "potential to unduly and unfairly prejudice" him by suggesting to the jury that the children needed protection.

At the December 12, 2011 final pretrial conference, the parties reiterated their positions. At the request of the district court, the government confirmed that its closure motion was based on the concern that an open courtroom would prevent the children from communicating effectively, and not on the concern that it would cause the children psychological harm. Defense counsel reiterated the concern that a closed courtroom "would affect the presumption of innocence." After hearing from the parties, the court explained the procedure it would follow before ruling on the closure motion. The court would first view the children's videotaped interviews in advance of trial, and then interview each child on the stand (out of the jury's view). Based on this additional information, the court would determine whether closure was necessary. The government opposed this procedure based on its view that the children would be more intimidated by the judge's questioning than by taking the stand. In response, the district court adopted a revised procedure. It stated that it would view the children's interviews and determine if the videotapes provided a sufficient basis to close the courtroom for one or more witnesses. If the court determined that the interviews did not establish a basis for closure, the court would deny the closure motion without prejudice to the government moving again for closure during the course of questioning at trial.

After reviewing the videotaped interviews, the court granted the government's motion. The court noted that Jane

Doe N.T. and Jane Doe S.A. (who were then five and six years old) were "very, very young," and John Does S.A., who was then ten years old, had "some cognitive impairments." The oldest girl, Jane Doe O.A., who was then twelve years old, while "articulate and mature for her age, is nonetheless a fairly young person." While all of the children mentioned "extreme family tensions and divisions and anger," Jane Doe O.A. "was the one who, it seems . . . more than others, seemed to be focused on the family difficulties that this case has caused, and the anger." Accordingly, the court ruled it would close the courtroom for all four children.

After making this ruling, the court stated that it would address the defendant's concern about undue prejudice. At the court's suggestion, the government agreed to call each victim near a time when the court would ordinarily take a break and clear the courtroom, then bring the jury back in to hear the victims' testimony without notifying the jury that the courtroom had been closed. This approach would "help alleviate any concern that the jury might be informed that this is a closed setting." In response to this discussion, defense counsel stated, "That's fine."

On January 5, 2012, on the first day of testimony before the jury was seated, the district court asked the government to confirm the procedure for closing the courtroom. The government stated that after the first adult witness was finished testifying, it would "ask to take a break" and "as soon as we are on that break, we should have a note that the courtroom is sealed at this time for this part of the testimony and have the courtroom locked." Later that day, John Doe S.A. testified about the day George molested him in the outhouse. Jane Doe N.T. then testified that George had molested her and Jane Doe S.A. by the parked car. The

following morning, while the jury was excused from the courtroom, the district court ordered the courtroom closed. When the jury returned to their seats, Jane Doe S.A. provided similar testimony. Jane Doe O.A. also testified that afternoon.

The jury convicted George on four counts of aggravated sexual abuse, and acquitted him of the remaining charges. The district court subsequently sentenced George to four concurrent 30-year terms of imprisonment as well as a lifetime of supervised release.

B

Timothy Yazzie lived on the Navajo reservation in Arizona where he cohabited with his girlfriend Sandra and her children from prior relationships. After Sandra's fourteen-year-old daughter R.J. told a school official that Yazzie had molested her, the school alerted the authorities, and R.J. was examined by a nurse practitioner and interviewed at the Flagstaff Medical Center Child Safe Center on April 8, 2011. In a videotaped interview, R.J. stated that Yazzie had forced her to engage in sexual intercourse on numerous occasions since she was thirteen years old. R.J. described in detail the first and last times Yazzie had sex with her. R.J. also told the interviewer about other abusive acts: she stated that Yazzie had hit and threatened to kill her mother, yelled at R.J., and whipped her and her siblings with a stick. Law enforcement agents subsequently searched Yazzie's residence and arrested him. In an interview with FBI Agent James Kraus, Yazzie admitted to having regularly engaged in sexual intercourse with R.J. over the course of eight months.

A superseding indictment charged Yazzie with three counts of aggravated sexual abuse of a minor in violation of 18 U.S.C. §§ 2241(c) and 2246.  The first count alleged that on or between January 1, 2010 and October 1, 2010, Yazzie engaged in a sexual act with R.J., involving "contact between the defendant's penis and the victim's vulva."  R.J. referred to this incident as the "first time."  The second count alleged that on or between March 1, 2011 and April 4, 2011, Yazzie engaged in a sexual act with R.J., involving "contact between the defendant's penis and the victim's vulva."  The third count alleged that on or between March 1, 2011 and April 4, 2011, Yazzie engaged in a sexual act with R.J., involving "intentional touching, not through the clothing, of the victim's genitalia with the defendant's hand, with an intent to abuse, humiliate, harass and degrade the victim and arouse and gratify the sexual desire of the defendant."  The sexual acts detailed in the second and third counts were both alleged to have occurred during "the 'last time' as described by" R.J. Despite his earlier admission to the federal agent, Yazzie pleaded not guilty to all charges.

The government filed a pretrial motion to close the courtroom during R.J.'s testimony.  The government stated that R.J. was "reluctant to discuss the sexual abuse" during her forensic interview, even though the only other person in the room was the interviewer.  During a subsequent interview with two attorneys, an FBI Agent, and a victim witness advocate, R.J. "cried for the majority of the interview." Because R.J. "has difficulty effectively communicating about her sexual abuse in small intimate settings," the government argued that she "would have even greater difficulty communicating in a large courtroom filled with spectators." Therefore, the government asserted that "[w]ithout the protections afforded under Title 18 U.S.C. § 3509, the child

victim . . . will likely be intimidated by the process and the environment, such that the result may be an incomplete testimony or an outright failure to testify." Yazzie opposed the motion.

The court granted the government's motion in a written order. Having viewed R.J.'s April 2011 forensic interview and "considering her age, maturity, and obvious discomfort when answering questions about the alleged sexual abuse," the court concluded that requiring R.J. "to testify in an open courtroom would likely cause [her] psychological harm and would result in [her] inability to effectively communicate." The court found that during R.J.'s interview she "was visibl[y] uncomfortable during the questioning and often retreated when asked difficult questions regarding the sexual abuse." Because she showed discomfort and difficulty communicating with only one other person present, the court concluded that "it is natural to presume that such discomfort would only be exacerbated in [a] more public setting." The court stated that closing the courtroom during R.J.'s testimony in this manner was a "less extreme alternative than other options for protecting the child witness, such as having the child witness's testimony conducted by closed circuit television." The order nevertheless gave individuals who wished to remain in the courtroom during the testimony the opportunity to present an argument for doing so.

At trial, R.J. testified regarding the "first time" and the "last time" that Yazzie forced her to engage in sexual intercourse. She stated that Yazzie threatened to kill R.J.'s mother if R.J. told her about his abuse. R.J. also stated that Yazzie showed her pornography, but described it as people having "S-E-X" because (she explained) it was difficult for her to say the word "sex" in the courtroom. She also

mentioned that Yazzie had threatened R.J.'s siblings with a sword, and hit her and her siblings with a stick.

At the end of the trial, the jury returned a guilty verdict on all three counts in the superseding indictment. Thereafter, the district court sentenced Yazzie to 420 months of imprisonment for each count, to be served concurrently, as well as a lifetime of supervised release.

II

George and Yazzie argue that closing the courtroom during the children's testimonies violated their Sixth Amendment rights to a public trial. Yazzie also maintains that the closure failed to comply with the requirements set out in 18 U.S.C. § 3509(e).

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial . . . ." U.S. Const. amend. VI. "Essentially, the public-trial guarantee embodies a view of human nature, true as a general rule, that judges, lawyers, witnesses, and jurors will perform their respective functions more responsibly in an open court than in secret proceedings." *Waller v. Georgia*, 467 U.S. 39, 46 n.4 (1984) (quoting *Estes v. Texas*, 381 U.S. 532, 588 (1965) (Harlan, J., concurring)).

The Sixth Amendment requirement of a public trial "is for the benefit the accused." *Id.* at 46 (internal quotation marks omitted). The interests of the defendant are protected because the public will see that the defendant "is fairly dealt with and not unjustly condemned" and the "presence of interested spectators may keep his triers keenly alive to a sense of their responsibility and to the importance of their functions." *Id.*

(internal quotation marks omitted). Further, a public trial will ensure that the "judge and prosecutor carry out their duties responsibly," and also "encourages witnesses to come forward and discourages perjury." *Id.*; *see also United States v. Rivera*, 682 F.3d 1223, 1228 (9th Cir. 2012). In addition to a defendant's Sixth Amendment right, the press and public have an implicit First Amendment right of access to criminal trials, *Waller*, 467 U.S. at 46; *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 580 (1980), which allows citizens to exercise their constitutionally protected right to discuss governmental affairs in an informed manner. *Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 604–05 (1982).

Although the right to a public trial is protected by the First Amendment and Sixth Amendment, it is not absolute. *Id.* at 606. In the First Amendment context, the Court held that "[t]he presumption of openness may be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest." *Press-Enterprise Co. v. Superior Court*, 464 U.S. 501, 510 (1984). The court must articulate the interest at stake "along with findings specific enough that a reviewing court can determine whether the closure order was properly entered." *Id.*

In applying the *Press-Enterprise* test to a defendant's Sixth Amendment challenge to a courtroom closure, the Court identified four separate factors. First, "the party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced." *Waller*, 467 U.S. at 48. The Supreme Court has recognized that "the physical and psychological well-being of a minor" is a compelling higher value that can justify a closure. *Globe*, 457 U.S. at 607–08;

*see also Press-Enterprise Co. v. Superior Court*, 478 U.S. 1, 9 n.2 (1986); *Charboneau v. United States*, 702 F.3d 1132, 1138 (8th Cir. 2013); *Bell v. Jarvis*, 236 F.3d 149, 168 (4th Cir. 2000) (concluding that the "state demonstrated an over-riding, compelling interest in protecting a child victim from the embarrassment and trauma associated with relating the details of multiple rapes and sexual molestation by a family member").  We have held that ensuring a child victim's ability to effectively communicate is also a compelling higher value that can justify a closure.  *See Geise v. United States*, 262 F.2d 151, 156–57 (9th Cir. 1958) (holding that an Alaska state court did not abuse its discretion in closing the courtroom during a rape victim's testimony "in view of the tender years of the prosecutrix . . . and the difficulty of obtaining [her] testimony before a large audience.").

Second, *Waller* held that "the closure must be no broader than necessary to protect that interest" of overriding importance.  467 U.S. at 48.  *Waller* held that the closure of an entire seven-day suppression hearing to protect the privacy of uncharged individuals whose voices had been intercepted on a two-and-a-half hour wiretap was overbroad.  *Id.* at 48–49.  Although protecting the uncharged parties' privacy interest could justify closing portions of a suppression hearing to the general public, the state had to explain the extent to which closure was necessary to protect these interests.  *Id.*  A closure that is more narrowly tailored to the interest at stake may pass constitutional muster however.  For instance, a temporary closure of a courtroom during the testimony of a rape victim is narrowly tailored where the purpose is to protect the victim from harm.  *See Bell*, 236 F.3d at 169.

Third, *Waller* held that "the trial court must consider reasonable alternatives to closing the proceeding." 467 U.S. at 48. *Waller* faulted the trial court for failing to consider whether it could close only those parts of a hearing that jeopardized the privacy interests of the uncharged individuals whose conversation had been intercepted by the wire taps. *Id.* at 48–49. "[T]rial courts are required to consider alternatives to closure even when they are not offered by the parties." *Presley v. Georgia*, 558 U.S. 209, 214 (2010); *see also United States v. Sherlock*, 962 F.2d 1349, 1359 (9th Cir. 1992).

Finally, the trial court "must make findings adequate to support the closure." *Waller*, 467 U.S. at 48. The court must identify "the particular interest, and threat to that interest . . . along with findings specific enough that a reviewing court can determine whether the closure order was properly entered." *Presley*, 558 U.S. at 215 (internal quotation marks omitted). Conclusory statements do not suffice. *Id.* at 216; *see also United States v. Waters*, 627 F.3d 345, 361 (9th Cir. 2010) (deeming insufficient a district court's statement that the hearing would be closed "'because that's the type of hearing it is'"). In order for the findings to be adequate, the district court must generally hold a hearing on a closure motion or otherwise give the defendant the opportunity to contest the closure motion. *Sherlock*, 962 F.2d at 1358.

These four *Waller* factors must be considered on a case-by-case basis, because even a compelling interest such as "safeguarding the physical and psychological well-being of a minor" cannot "justify a mandatory closure rule." *Globe*, 457 U.S. at 607–08 (emphasis omitted). Rather, a court must consider the "circumstances of the particular case," such as "the minor victim's age, psychological maturity and understanding, the nature of the crime, the desires of the

victim, and the interests of parents and relatives," because these factors may affect the significance of the interest. *Id.*[4]

In addition to these constitutional requirements, Congress has given a federal district court statutory authorization to close a courtroom during the testimony of a minor witness "if the court determines on the record that requiring the child to testify in open court would cause substantial psychological harm to the child or would result in the child's inability to effectively communicate." *See* 18 U.S.C. § 3509(e). The order must "be narrowly tailored to serve the Government's specific compelling interest." *Id.*

III

We now apply this legal framework to George and Yazzie's claims. We review George and Yazzie's Sixth Amendment claims de novo. *United States v. Ivester*, 316 F.3d 955, 958 (9th Cir. 2003). We review the district court's factual findings for clear error. *See United States v.*

---

[4] Partial closure of a courtroom has a reduced impact on a defendant's rights. Therefore, a trial court ordering such a partial closure need provide only a "substantial reason" for the closure as opposed to an "overriding interest." *Sherlock*, 962 F.2d at 1357. We deem a closure to be partial when specified individuals are excluded, rather than the public as a whole. *See id.* (applying partial closure standard where family members of the defendant were excluded); *see also Judd v. Haley*, 250 F.3d 1308, 1315 (11th Cir. 2001). The government asserts that this less onerous standard applies to both George and Yazzie, because in both cases the court allowed some individuals to remain in the courtroom during the victims' testimonies. We need not decide this issue here, because we resolve George and Yazzie's argument that the district court erred in closing the courtroom on different grounds. *See Rivera*, 682 F.3d at 1236 (declining to decide whether closure was partial or total because it violated defendant's Sixth Amendment right under either standard).

*Mendoza*, 530 F.3d 758, 762 (9th Cir. 2008).  We review the district court's interpretation of a statute de novo, *see United States v. Banks*, 556 F.3d 967, 972 (9th Cir. 2009), and review the court's application of the statute to the facts for abuse of discretion, *Advanced Micro Devices, Inc. v. Intel Corp.*, 292 F.3d 664, 666 (9th Cir. 2002), *aff'd*, 542 U.S. 241 (2004).

## A

We begin by considering George's claim that the closure of the courtroom during the four children's testimonies violated his Sixth Amendment right to a public trial.  We disagree, because the district court adequately complied with the four factors set out in *Waller*.[5]

First, the district court properly determined that there was "an overriding interest that is likely to be prejudiced." *Waller*, 467 U.S. at 48.  Specifically, it found that the children's abilities to effectively communicate their stories at trial would be adversely affected absent closure of the courtroom.  *See Geise*, 262 F.2d at 156–57.  In reaching this conclusion, the court noted the children's youth, the mental difficulties of one of the children, and the family tensions arising from George being a relative of the victims, all of which had the potential to impact the children's testimony.

Second, the closure was narrowly tailored to the asserted interest because the district court closed the courtroom only when the child victims took the stand.  Unlike the situation in *Waller*, where the trial court closed the courtroom for the

---

[5] Because George does not allege that the closures violated § 3509(e), we do not reach this issue in his case.

entire seven-day suppression hearing without considering the specific need for privacy, here all portions of the trial other than the minor witnesses' testimony were public. Further, the district court orchestrated the closures around breaks in the proceedings to address George's specific concern that the closures would prejudice him by affecting the presumption of innocence in the eyes of the jury.

On appeal, George argues that because the clerk's minutes and trial transcripts do not indicate precisely when the courtroom was opened and closed, the courtroom might have remained closed after the children were through testifying. Though we review for plain error because George did not raise this objection at trial, *see United States v. Withers*, 638 F.3d 1055, 1065 n.4 (9th Cir. 2010), this argument fails under any standard of review. Even now, George does not allege that the courtroom was closed after the children had left the witness stand. In the absence of evidence in the record, or even any allegation by defense counsel, we presume that the district court followed the law, *see United States v. Segal*, 549 F.2d 1293, 1296 (9th Cir. 1977), and implemented its own order to close the courtroom only when the children were testifying.

Third, the district court considered reasonable alternatives to closure. The district court held that it would have denied the closure motion without prejudice to renewal at trial had the videotaped interviews been insufficient to establish a basis upon which to close the courtroom. The district court also indicated that it would make a determination about the need for closure individually as to each child witness, and that its ruling "could be different with respect to each one."

George now contends that the court should have also considered alternatives to live in-court testimony, such as testimony via a two-way closed circuit television or videotaped depositions. We disagree. While a court must "consider alternatives to closure even when they are not offered by the parties," *Presley*, 558 U.S. at 214, *Waller* makes clear that trial courts need consider only "reasonable alternatives" that are more narrowly tailored and more protective of constitutional rights than the closure advocated by the government. For instance, instead of closing an entire hearing, a trial court should consider the reasonable alternative of "closing only those parts of the hearing that jeopardized the interests advanced," *Waller*, 467 U.S. at 48. Similarly, instead of excluding the public from a voir dire of prospective jurors, the trial court should have adopted the reasonable alternative of finding additional space in the courtroom to accommodate members of the public who wished to attend. *Presley*, 558 U.S. at 215. But a district court need not sua sponte consider alternatives that would potentially have a significant impact on the defendant's constitutional right to a fair trial and substantially alter the nature of the proceedings. *See Ayala v. Speckard*, 131 F.3d 62, 72 (2d Cir. 1997) ("Even if *Waller* requires a trial judge to consider alternatives to complete closure, we do not believe that the Supreme Court wanted trial judges selecting the alternative of limited closure to consider further alternatives that themselves pose substantial risks to a fair trial for the defendant."). Here, a two-way closed circuit television or videotaped depositions, such as George now recommends, would materially change the nature of the proceedings. These alternatives prohibit face-to-face confrontation during cross-examination and raise substantial Confrontation Clause issues. *See Maryland v. Craig*, 497 U.S. 836, 856–57 (1990); *United States v. Miguel*,

111 F.3d 666, 671 (9th Cir. 1997). In the absence of any request by George, the district court's failure to address sua sponte alternatives that raise significant additional constitutional concerns did not violate George's Sixth Amendment rights.[6]

Finally, the district court made adequate findings to support the closure. Before ruling on the government's order, the district court confirmed that the basis of the government's motion was its concern that an open courtroom would preclude the children from communicating effectively. The court's subsequent findings, after reviewing the videotaped interviews, were relevant to this specific issue. Although the district court did not expressly state that closure was necessary to facilitate the children's testimony, its findings are clear in context. *See Sherlock*, 962 F.2d at 1359 (noting the court's findings were sufficient to allow the reviewing court to "conclude there was a substantial reason to close the proceedings"); *see also United States v. Farmer*, 32 F.3d 369, 371 (8th Cir. 1994) (holding that "specific findings by the district court are not necessary if we can glean sufficient support for a partial temporary closure from the record."). The court afforded George an opportunity to be heard at the final pretrial conference, and he did not challenge the government's articulation of its overriding concern. Therefore, the district court's on-the-record findings were sufficient.

Because the court's rulings complied with the factors set forth in *Waller*, we conclude the court closure during the

---

[6] Moreover, the government's reply brief in support of its § 3509(e) motion mentioned these alternatives, and thus the district court implicitly rejected them in ordering a temporary closure of the courtroom.

children's testimonies did not violate George's Sixth Amendment right to a public trial.

B

We next consider Yazzie's claim that the district court's order to close the courtroom during R.J.'s testimony violated his Sixth Amendment right to a public trial. This claim likewise fails, because the district court's order carefully addressed each of the *Waller* factors.

First, the district court identified overriding interests that would be prejudiced absent a temporary closure of the courtroom and concluded that requiring R.J. to testify in open court "would likely cause [her] psychological harm and would result in [her] inability to effectively communicate." *See Globe*, 457 U.S. at 607–08; *Geise*, 262 F.2d at 156–57.

Second, the court's closure order was narrowly tailored to address those interests. The court ordered that the courtroom be closed only during R.J.'s testimony. Moreover, the court stated that it would allow any spectator, whether a member of the media, public, or family or friends of the defendant or the child witness, "the opportunity to articulate a sufficient interest in remaining in the courtroom during the child witness's testimony," and would individually determine whether to allow such spectator to remain in the courtroom.

The court also considered reasonable alternatives, stating that its limited closure order was "a less extreme alternative than other options for protecting the child witness, such as having the child witness's testimony conducted by closed circuit television."

Finally, the court made findings that sufficiently identified the particular interest at stake and the threat to that interest. After giving Yazzie the opportunity to be heard, the court noted the government's testimony regarding R.J.'s anxiety and its concern that the presence of defendant's family members would have a chilling effect on her testimony. Further, the court stated that it had independently reviewed the videotape of an interview with R.J., and reached a similar conclusion. These findings provide ample support for the court's determination that closing the courtroom was justified to protect R.J.'s psychological well being and ability to communicate effectively.

Yazzie claims the district court's methodology for determining the strength of the asserted interests was not sufficiently rigorous. According to Yazzie, the district court erred in relying on the prosecutor's statements and its review of a seven-month-old video. Instead, Yazzie contends that the court should have had the child evaluated by a behavioral scientist, appointed a guardian ad litem, or observed the child in person, prior to making its determination. We disagree. The court made reasonable determinations based on its review of the videotape, the government's assertions, and its commonsense understanding that child victims may have difficulty testifying about sexual abuse in a public setting where the defendant's friends and family are present. While a court may consider expert testimony on a child's psychological well-being or ability to testify, it is not constitutionally required to do so. Moreover, although the court gave Yazzie an opportunity to be heard, he did not raise this issue to the district court or explain his reasons for believing that such additional investigation was justified in this particular case. Accordingly, the district court did not commit error, let alone plain error, in not requiring this

additional information.  *See Globe*, 457 U.S. at 608 (noting that the trial court must determine on a "*case-by-case* basis" whether closure is necessary and listing several factors for the court's consideration (emphasis added)).[7]  For these reasons, we conclude that the court closure did not violate Yazzie's Sixth Amendment right to a public trial.

C

Yazzie also maintains that the district court's closure order violated the requirements set out in 18 U.S.C. § 3509(e).  Yazzie first contends that the court violated § 3509(e) by failing to follow the procedures set forth in § 3509(g) and (h) or by failing to hold a hearing to examine the child witness.  Again, we disagree.

Section 3509 makes available a range of procedures to protect the rights of child victims and witnesses.  In addition to authorizing closure of the courtroom, *id.* § 3509(e), the statute authorizes courts to protect children from testifying in open court under certain circumstances by allowing them to testify via two-way closed circuit television or videotaped depositions,  *id.* § 3509(b).  Section 3509 also authorizes a court to work with a "multidisciplinary child abuse team" established by state and local governments to assist child victims and witnesses.  *Id.* § 3509(g).  These teams provide expert services to a child, including medical evaluations

---

[7] Yazzie points to R.J.'s testimony on the stand that she was "feeling happy" the day of trial and defense counsel's observation that R.J. "seemed far more composed [at trial] than one would have predicted by listening to the prosecutor's pretrial assessment of R.J."  But we must evaluate the reasonableness of the court's conclusion at the time it ordered the closure, and cannot rely on hindsight based on events that occurred during the trial.

related to abuse or neglect and psychological and psychiatric diagnoses. *Id.* The court is also authorized to appoint a guardian ad litem "to protect the best interests of the child" and "make recommendations to the court concerning the welfare of the child." *Id.* § 3509(h).

By its terms, § 3509(e) does not require the court to hear testimony from the child, a guardian ad litem, or expert, prior to deciding a closure motion. While § 3509(g) and (h) authorize the court to use experts and guardians ad litem to further the interests of the child, neither of these provisions limit or condition the court's authority under § 3509(e). Indeed, Congress required expert testimony in only one limited circumstance. When a court orders that a child's testimony be taken by two-way closed circuit television, the order must be supported by the court's finding that the child is unable to testify in open court in the presence of the defendant for any one of four reasons. *Id.* § 3509(b)(1)(B). Only one of these four reasons requires an expert: the court's finding that "[t]here is a substantial likelihood, *established by expert testimony*, that the child would suffer emotional trauma from testifying." *Id.* § 3509(b)(1)(B)(ii) (emphasis added). Because Congress knew how to impose a requirement that the court obtain expert testimony, and enacted such a requirement in one limited circumstance, the absence of any similar language in § 3509(e) underscores our determination that it imposes no similar requirement.

Finally, Yazzie argues that the court erred by excluding family members of the defendant under § 3509(e), which allows a district court to exclude only those persons "who do not have a direct interest in the case." Yazzie claims that his family members have a direct interest in his case, and therefore should not have been excluded. We reject this

argument. While family members of the victim or defendant may have a more intense personal interest in a case than members of the general public, they do not have a *direct* interest in a criminal case as do the defendant and the government, and their attorneys at trial. The statute does not require a court to evaluate the level of concern a member of the public (whether a member of the media or a family member) may have regarding the outcome of a particular trial. Indeed, Yazzie's argument that a defendant's family members cannot be excluded from a trial is contrary to the protective goals of § 3509, because child victims and witnesses are often most intimidated by the defendant's family members among the spectators. *See, e.g.*, *Sherlock*, 962 F.2d at 1359 (affirming exclusion during rape victim's testimony of defendant's family members who "peered and giggled" at the witnesses); *United States v. Osborne*, 68 F.3d 94, 97 (5th Cir. 1995); *cf. Woods v. Kuhlmann*, 977 F.2d 74, 77 (2d Cir. 1992); *Nieto v. Sullivan*, 879 F.2d 743, 753–54 (10th Cir. 1989).

Accordingly, we conclude that Yazzie's statutory argument is also without merit and that the district court's closure order did not violate § 3509(e).

IV

Finally, we turn to Yazzie's argument that his convictions on the second and third counts alleged in the indictment violate the Double Jeopardy Clause. Yazzie asserts that the conduct alleged in the second count, a sexual act with R.J. involving "contact between the defendant's penis and the victim's vulva," and the conduct alleged in the third count, a sexual act with R.J. involving "intentional touching, not through the clothing, of the victim's genitalia with the

defendant's hand" both occurred during the incident that R.J. termed the "last time," and therefore impose multiple criminal punishments for the same offense.

Because Yazzie failed to raise this claim to the district court, we review for plain error. *United States v. Sykes*, 658 F.3d 1140, 1149 (9th Cir. 2011). "Under the plain error standard, we will affirm . . . unless: (1) there has been an error in the proceedings below; (2) that error was plain; (3) it affected substantial rights; and (4) it seriously affected the fairness, integrity, or public reputation of judicial proceedings." *United States v. Davenport*, 519 F.3d 940, 943 (9th Cir. 2008).[8]

The Double Jeopardy Clause of the Fifth Amendment states: "[N]or shall any person be subject for the same offense to be twice put in jeopardy of life or limb . . . ." U.S. Const., amend. V. "[S]ince Congress has full authority to define distinct offenses and to prescribe punishments for those offenses, 'the question of what punishments are constitutionally permissible is not different from the question of what punishments the Legislative Branch intended to be imposed.'" *United States v. Wolfswinkel*, 44 F.3d 782, 784 (9th Cir. 1995) (quoting *Albernaz v. United States*, 450 U.S. 333, 344 (1981)). "If Congress enacts statutes that indicate an intent to impose separate punishments, those statutes define separate offenses, and the punishments do not violate the Constitution." *Id.* Once Congress has defined an offense in a statute, we must determine the "allowable unit of

---

[8] Although Yazzie is concurrently serving the sentences imposed for these convictions, the issue is not moot because the potential collateral consequences of an additional conviction affect substantial rights. *See Davenport*, 519 F.3d at 947.

prosecution" defined by Congress. *United States v. Universal C.I.T. Credit Corp.*, 344 U.S. 218, 221 (1952). The issue is therefore one of statutory construction. *See Bell v. United States*, 349 U.S. 81, 81, 83–84 (1955); *see also Sanabria v. United States*, 437 U.S. 54, 69–70 (1978).

Accordingly, we begin with the text of 18 U.S.C. § 2241(c), the statute of conviction, which provides:

> Whoever . . . knowingly engages in a *sexual act* with another person who has not attained the age of 12 years, or knowingly engages in a sexual act under the circumstances described in subsections (a) and (b) with another person who has attained the age of 12 years but has not attained the age of 16 years (and is at least 4 years younger than the person so engaging), or attempts to do so, shall be fined under this title and imprisoned for not less than 30 years or for life.

18 U.S.C. § 2241(c) (emphasis added). The term "sexual act" is defined in a separate provision as:

> (A) contact between the penis and the vulva or the penis and the anus, and for purposes of this subparagraph contact involving the penis occurs upon penetration, however, slight;

> (B) contact between the mouth and the penis, the mouth and the vulva, or the mouth and the anus;

(C) the penetration, however slight, of the anal or genital opening of another by a hand or finger or by any object, with an intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person; or

(D) the intentional touching, not through the clothing, of the genitalia of another person who has not attained the age of 16 years with an intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person[.]

18 U.S.C. § 2246(2).

Because § 2241(c) makes it unlawful to engage in a "sexual act," and § 2246(2) defines "sexual act" as any one of four specific actions, we conclude that the "allowable unit of prosecution" intended by Congress is each individual sexual act listed in § 2246(2). Although Congress could have defined "sexual act" to mean a single sexual encounter involving one or more of the actions listed in § 2246(2), Congress chose not to do so, and instead made each type of conduct listed in § 2246(2) a separate "sexual act" criminalized by § 2241(c). Because Congress's intent is the touchstone for determining the scope of protection afforded by the Double Jeopardy Clause, we conclude that each sexual act listed in § 2246(2) constitutes a separate violation of § 2241(c). Therefore, a defendant can be convicted of multiple violations of § 2241(c) for performing multiple listed sexual acts without violating the Double Jeopardy Clause's protection against multiple punishments for the same offense, even if the defendant performed those sexual acts in the course of a single sexual encounter. In reaching

this conclusion, we join the only other circuit to have considered this issue. *See United States v. Two Elk*, 526 F.3d 890, 898–99 (8th Cir. 2008) (holding that § 2241(c) punishes separate acts, not a single course of conduct).

In light of this analysis, Yazzie's convictions under the second and third counts in the superseding indictment do not raise double jeopardy concerns. Although the conduct described in those counts both occurred during "the last time" as described by R.J., each count alleges a separate sexual act that is listed in § 2246(2). We conclude there was no error—much less plain error—in allowing both convictions on Count II and Count III to stand.

While Yazzie concedes that § 2241(c), when read in conjunction with § 2246(2), allows separate punishments for each act set forth in § 2246(2), he argues that Congress did not intend that a defendant be punished for two sexual acts in circumstances where the first is "merely incidental" to the second. This argument is meritless, because in determining whether a conviction imposes multiple criminal punishments for the same offense, we look only to Congressional intent, not to whether one offense was incidental to another.[9] As the Supreme Court has explained, "[i]n determining the permissibility of the imposition of cumulative punishment for the crime of rape and the crime of unintentional killing in the course of rape," the "dispositive question was whether Congress intended to authorize separate punishments for the two crimes." *Albernaz*, 450 U.S. at 344 (internal quotation

---

[9] For the same reason we reject Yazzie's contention that "R.J.'s testimony left entirely open the question of whether the act described in count three was a necessary or functional part of the act described in count two."

marks omitted); *cf. Rhoden v. Rowland*, 10 F.3d 1457, 1461 (9th Cir. 1993) ("[I]t is well settled that a single transaction can give rise to distinct offenses under separate statutes without violating the Double Jeopardy Clause." (internal quotation marks omitted)).  We rejected a similar argument raised by a habeas petitioner convicted of both the sexual act of digital penetration and the act of intercourse.  *Rhoden*, 10 F.3d at 1461–62.  Although the petitioner argued that because "the digital penetration was incidental to the act of intercourse" it could not "constitutionally be punished as a separate crime," we concluded that the two offenses were separate under California law, and therefore the conviction on both offenses did not give rise to any Double Jeopardy concern.  *Id.*

**AFFIRMED.**