**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA, *Plaintiff-Appellee*, <br><br> v. <br><br> JAMES DAVID ALLEN II, *Defendant-Appellant.* | No. 21-10060 <br><br> D.C. No. 4:20-cr-00300-HSG-1 <br><br> OPINION |

Appeal from the United States District Court
for the Northern District of California
Haywood S. Gilliam, Jr., District Judge, Presiding

Argued and Submitted December 6, 2021
San Francisco, California

Filed May 16, 2022

Before: Carlos F. Lucero,* Sandra S. Ikuta, and
Lawrence VanDyke, Circuit Judges.

Opinion by Judge Ikuta

---

* The Honorable Carlos F. Lucero, United States Circuit Judge for the U.S. Court of Appeals for the Tenth Circuit, sitting by designation.

## SUMMARY[**]

### Criminal Law

The panel vacated James Allen's conviction and the district court's denial of his motion to suppress, and remanded for a new suppression hearing and a new trial, in a case in which the district court, at the height of the coronavirus pandemic in 2020, prohibited members of the public from attending Allen's suppression hearing and trial and rejected his request for video-streaming of the proceedings.

The panel held that the district court's COVID protocols violated Allen's Sixth Amendment right to a public trial.

The panel explained that the "public trial" guaranteed by the Sixth Amendment is impaired by a rule that precludes the public from observing a trial in person, regardless whether the public has access to a transcript or audio stream. Although the district court treated its decision to allow only audio access to the trial as a partial closure, the panel concluded that the court's order effected a total closure because *all* persons other than witnesses, court personnel, the parties and their lawyers were excluded from attending the suppression hearing or trial. In order to determine whether the court's order violated Allen's public trial right, the panel therefore needed to determine whether there was an overriding interest that made the closure essential, and whether the court

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

considered reasonable alternatives to ensure that the closure order was narrowly tailored.

Given the impact of the COVID pandemic on Northern California at the time the court was attempting to schedule Allen's trial, the panel agreed that the goal of limiting the transmission of COVID while holding a trial was an overriding interest. The panel concluded that the district court's complete prohibition on the public's visual access was not, however, narrowly tailored. Noting that courts throughout the country, facing the same need to balance public health issues against a defendant's public trial right, consistently developed COVID protocols that allowed some sort of visual access to trial proceedings, the panel wrote that the district court cannot show that allowing a limited number of members of the public to view the trial in the courtroom, or via a live-streamed video in a different room, would imperil public health.

The panel emphasized that an order prohibiting the public's visual access to a trial or suppression hearing will not always violate the defendant's public trial right, as certain interests (such as national security) may be so compelling that prohibiting the public's observation of some or all of the proceedings may be warranted.

The panel wrote that the only remedy appropriate to the violation is a new suppression hearing and a new trial.

The panel addressed in a contemporaneously filed memorandum disposition Allen's challenge to the district court's denial of his motion to dismiss the indictment under the Speedy Trial Act.

**COUNSEL**

Lisa Ma (argued), Assistant Federal Public Defender; Geoffrey A. Hansen, Acting Federal Public Defender; Office of the Federal Public Defender, Oakland, California; for Defendant-Appellant.

Noah Stern (argued), Assistant United States Attorney; Matthew M. Yelovich, Chief, Appellate Section, Criminal Division; Stephanie M. Hinds, Acting United States Attorney; United States Attorney's Office, Oakland, California; for Plaintiff-Appellee.

**OPINION**

IKUTA, Circuit Judge:

At the height of the coronavirus pandemic in 2020, the district court here prohibited members of the public from attending the defendant's suppression hearing and trial and rejected the defendant's request for video-streaming of the proceedings. This appeal raises the question whether the court's order violated the defendant's Sixth Amendment right to a public trial. We conclude that the district court's order was not narrowly tailored, in part because courts throughout the country, facing the same need to balance public health issues against a defendant's public trial right, consistently developed COVID protocols that allowed some sort of visual access to trial proceedings. Accordingly, we conclude that the court's COVID protocols in this case violated the

defendant's public trial right, and he is entitled to a new suppression hearing and trial.[1]

I

In July 2020, police officers were dispatched to a residential street in Pinole, California, where they found James Allen sitting in a stolen vehicle. An inventory search uncovered a loaded AR-15 style rifle. The officers arrested Allen, who was subsequently indicted on one count of being a felon in possession of a firearm and ammunition, in violation of 18 U.S.C. § 922(g)(1).

The district court's effort to schedule Allen's trial was hampered by the impact of the global coronavirus (COVID) pandemic. Beginning in March 2020 and continuing through all periods relevant to this appeal, the COVID pandemic shut down much of California: the governor declared a state of emergency in March 2020, issued a stay-at-home order for non-essential workers, and closed most non-essential businesses. The stringency of these restrictions ebbed and flowed during the relevant time period, depending on the number of reported COVID cases and deaths, but most restrictions remained in place throughout 2020.

---

[1] We address Allen's challenge to the district court's denial of Allen's motion to dismiss the indictment under the Speedy Trial Act in a memorandum disposition filed concurrently with this opinion. *See* ___ Fed. App'x ___. Allen's other claims on appeal are moot in light of our holding here.

These events significantly impacted state and federal trial courts. The Chief Judge of the Northern District of California (the district in which the court here was located) issued a series of general orders prescribing COVID protocols. In September 2020, at the time the district court here was preparing for Allen's trial, the relevant general order stated that criminal jury trials "may proceed in accordance with the logistical considerations necessitated by the Court's safety protocols." United States District Court for the Northern District Of California, General Order No. 72-6: In re: Coronavirus Disease Public Health Emergency (September 16, 2020). According to the court's website at the time, "persons who have been authorized by a judge or the Clerk of Court may enter courthouse property."

Notwithstanding these general orders, the judge presiding over Allen's proceedings adopted additional COVID restrictions. The court's protocol for Allen's pretrial hearings and trial precluded members of the public from entering the courtroom, and gave them access to the proceedings only by streaming audio over the internet.

Allen objected to this protocol as violating his Sixth Amendment right to a public trial. At a hearing to consider this and other pretrial issues, Allen's counsel argued that while neither audio nor video streaming of the trial was equivalent to an in-person trial, Allen would accept video as "an adequate substitute" for public access because it "comes closer to recapturing that in-person experience more so than telephone." According to counsel, "the ability to have the courtroom open is not simply to hear the witnesses but to see the witnesses, to see the jury, to see the defendant, to see the attorneys, see the court," as well as "to see the exhibits . . . and have as close to a re-creation of that ability to walk into

the courthouse." By contrast, counsel asserted, telephone access was not an adequate substitute because "you miss all of that flavor." Counsel argued that this factual difference adds up to "a constitutional legal difference."

After a hearing, the district court denied Allen's objection. The court assumed "that audio access constitutes a partial closure" of the court. Nevertheless, the court held there was "an abundantly clear substantial reason for the closure" which was the "compelling objective of keeping people safe and limiting the spread of the virus." Therefore, the court concluded, it was "clear as a matter of public health that the number of people in the courthouse have to be limited."

The court also held that its protocols were narrowly tailored to the interest in stemming the spread of COVID. The court ruled that there was no basis "for concluding that there's a constitutional difference between audio and video." It then rejected the counsel's proposed alternative of video-streaming the trial. According to the court, it would be improper to live-stream the proceedings over the internet because the court would be unable to prevent viewers from recording the trial.[2] And the court concluded that live-streaming the video to a different room in the courthouse would not meet the objectives of closing the courthouse and curbing the spread of COVID, because it would not limit the

---

[2] The district court was apparently concerned that live streaming the trial on the internet would make it difficult to prevent recording of the trial in violation of Rule 53 of the Federal Rules of Criminal Procedure, which provides: "Except as otherwise provided by a statute or these rules, the court must not permit the taking of photographs in the courtroom during judicial proceedings or the broadcasting of judicial proceedings from the courtroom."

number of persons in the courthouse. Finally, the court stated that not everyone in the public had the means to view a streamed video, whereas telephone access was more widely accessible. Because there was a substantial reason for limiting access to the courthouse, and the audio access option was narrowly tailored, the court concluded that its protocol was constitutionally adequate "for Sixth Amendment purposes." The suppression hearing and the trial proceeded according to this protocol.

After trial, the jury returned a guilty verdict and the district court sentenced Allen to six years in federal custody followed by a three year term of supervised release. Allen filed a timely notice of appeal.

We have jurisdiction under 28 U.S.C. § 1291. We review public trial claims de novo. *United States v. Waters*, 627 F.3d 345, 359 (9th Cir. 2010).

II

From "the days before the Norman Conquest," despite "great changes in courts and procedures . . . one thing remained constant: the public character of the trial at which guilt or innocence was decided." *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 565–66 (1980). The "presumptive openness of the trial, which English courts were later to call 'one of the essential qualities of a court of justice,'" was also "an attribute of the judicial systems of colonial America." *Id.* at 567 (citation omitted). The principle that trials should be open to the public was eventually incorporated into the Sixth Amendment, which provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial . . . ." U.S. Const. amend. VI.

A

The scope of the public trial right must be understood in light of its purposes. The "public trial guarantee" is a right "created for the benefit of the defendant." *Gannett Co., Inc. v. DePasquale*, 443 U.S. 368, 380 (1979).[3] The open nature of the proceedings protects the defendant by ensuring "that the public may see he is fairly dealt with and not unjustly condemned, and that the presence of interested spectators may keep his triers keenly alive to a sense of their responsibility and to the importance of their functions." *In re Oliver*, 333 U.S. 257, 270 n.25 (1948); *see also Gannett Co.*, 443 U.S. at 383 ("Openness in court proceedings may . . . cause all trial participants to perform their duties more conscientiously, and generally give the public an opportunity to observe the judicial system."). There is also a societal interest in public observation of trial proceedings because, among other things, such observation gives "assurance to those not attending trials that others were able to observe the proceedings and enhanced public confidence." *Press-Enterprise Co. v. Superior Ct. of California, Riverside Cty.*, 464 U.S. 501, 507 (1984).

The purposes of the public trial right are advanced most by the public's ability to observe the trial. This is confirmed by "our English common law heritage," in which the public trial right "has its roots." *In re Oliver*, 333 U.S. at 266. For example, Sir William Blackstone explained in 1768 that this "open examination of witnesses viva voce, in the presence of

---

[3] The public does not have a Sixth Amendment right to a public trial, though the Supreme Court has determined that "the right to attend criminal trials is implicit in the guarantees of the First Amendment." *Richmond*, 448 U.S. at 580.

all mankind, is much more conducive to the clearing up of truth than the private and secret examination before an officer or his clerk." 3 W. Blackstone, Commentaries on the Laws of England 373 (1768). And in 1820, Sir Matthew Hale noted that, in English trials, "evidence is given 'in the open court and in the presence of the parties, counsel, and all by-standers.'" Max Radin, *The Right to a Public Trial*, 6 Temp. L.Q. 381, 382 (1932) (quoting M. Hale, *History of the Common Law of England*, ch. XII, 343 (1820)).

Early state court cases echo this common-law emphasis on public observation. In 1846, the Supreme Court of Ohio explained that it is the defendant's right to have the public "witness the manner, tone, and temper of his prosecution," and that "all that can be said or preferred against him, and all that can be said or urged in his favor, shall be in the hearing and presence of the public." *Kirk v. State*, 14 Ohio 511, 512–13 (Ohio 1846). Similarly, in 1884, Justice Holmes (then of the Supreme Judicial Court of Massachusetts) explained that "the trial of causes should take place under the public eye . . . because it is of the highest moment that those who administer justice should always act under the sense of public responsibility, and that every citizen should be able to satisfy himself with his own eyes as to the mode in which a public duty is performed." *Cowley v. Pulsifer*, 137 Mass. 392, 394 (Mass. 1884). Federal and state courts throughout the late nineteenth-century and early twentieth-century continued to underscore the significance of the public's ability to observe trials. *See People v. Hartman*, 103 Cal. 242, 245 (Cal. 1894) ("The trial should be 'public,' in the ordinary commonsense acceptation of the term. The doors of the court room are expected to be kept open, [and] the public are entitled to be admitted . . . ."); *Davis v. United States*, 247 F. 394, 395 (8th Cir. 1917) ("As the expression

necessarily implies, a public trial is a trial at which the public is free to attend."); *State v. Hensley*, 79 N.E. 462, 463 (Ohio 1906) ("[A] public trial means one which is not limited or restricted to any particular class of the community, but is open to the free observation of all.").

Because of the importance of public observation of court proceedings, transcripts of a trial are not an adequate substitute for access to the courtroom to observe the trial. "[T]ranscripts of testimonial evidence which cannot capture the sweaty brow, the shifty eye, the quavering voice never fully reflect what was communicated by the testifying witness." *In re Schoenfield*, 608 F.2d 930, 935 (2d Cir. 1979); *see also Skilling v. United States*, 561 U.S. 358, 386 (2010) (noting the difficulty of "second-guessing" a trial judge's decisions in *voir dire* given that a judge is "influenced by a host of factors impossible to capture fully in the record—among them, the prospective juror's inflection, sincerity, demeanor, candor, body language, and apprehension of duty"). The Supreme Court has implicitly recognized that a transcript is not an adequate substitute for an open trial. *See In re Oliver*, 333 U.S. at 259, 271 (stating, in a case where a "stenographer was most likely" present at the proceedings, that "recordation" of a trial would not remedy the evils posed by secret trials, and ruling that a closed trial violated the defendant's public trial right); *see also Waller v. Georgia*, 467 U.S. 39, 43–49 (1984) (holding, in a case where a transcript of the proceeding had been released to the public, that a closed proceeding violates the Sixth Amendment public trial right).

For purposes of the public trial right, an audio stream is not substantially different than a public transcript. Although a listener may be able to detect vocal inflections or emphases that could not be discerned from a cold transcript, an audio stream deprives the listener of information regarding the trial participant's demeanor and body language. Nor can a listener observe the judge's attitude or the reactions of the jury to a witness's testimony, or scan any visual exhibits. Like a transcript, then, an audio stream cannot "fully reflect what was communicated by the testifying witness." *In re Schoenfield*, 608 F.2d at 935. Indeed, the district court here implicitly acknowledged the value of visual observation when it required witnesses at the suppression hearing and trial to wear clear masks. Further, any failure to make the judge, counsel, defendant and jury subject to the public's eye (as well as its ear) undermines confidence in the proceedings. *See Press-Enterprise*, 464 U.S. at 505. Therefore, the "public trial" guaranteed by the Sixth Amendment is impaired by a rule that precludes the public from observing a trial in person, regardless whether the public has access to a transcript or audio stream.

B

Because the public's ability to observe the trial lies at the core of the public trial right, the district court's decision to preclude the public from attending the trial and to allow only audio access burdened Allen's public trial right. The parties do not dispute this.

But like other constitutional rights, a defendant's right to a public trial is not absolute. *United States v. Yazzie*, 743 F.3d 1278, 1286 (9th Cir. 2014). The Supreme Court has held that "the right to an open trial may give way in certain cases to other rights or interests." *Waller*, 467 U.S. at 45.

The test for determining whether a particular closure order violates a defendant's public trial right changes depending on whether the courtroom closure is total or partial. A total closure of the courtroom means that "*all* persons other than witnesses, court personnel, the parties and their lawyers are excluded for the duration of the hearing," *United States v. Rivera*, 682 F.3d 1223, 1236 (9th Cir. 2012) (cleaned up). A partial closure means the court has excluded only a limited number of persons from the courtroom, either for the duration of the proceeding or for a limited period of time (such as during one witness's testimony). *See United States v. Sherlock*, 962 F.2d 1349, 1357 (9th Cir. 1989).

Before ordering a total closure, the court must determine that there is "an overriding interest based on findings that closure is essential to preserve higher values." *Id.* at 1356 (quoting *Waller*, 467 U.S. at 45). If there was only a partial closure, there must be a substantial interest, rather than an overriding interest, for the closure. *See Rivera*, 682 F.3d at 1236. In addition, any closure must be "narrowly tailored to serve" the overriding or substantial interest at issue, and the court must consider reasonable alternatives to closing the courtroom. *Id.* at 1235. Courts must sua sponte consider possible alternatives to a closure "even when they are not offered by the parties." *Presley v. Georgia*, 558 U.S. 209, 214 (2010).

Although the district court here treated its decision to allow only audio access to the trial as a partial closure, we conclude that the court's order effected a total closure because "*all* persons other than witnesses, court personnel, the parties and their lawyers [were] excluded" from attending the suppression hearing or trial. *Rivera*, 682 F.3d at 1236 (internal quotation marks omitted). Therefore, in order to determine whether the court's order violated Allen's public trial right, we must determine whether there was an overriding interest that made the closure essential, and whether the court considered reasonable alternatives to ensure that the closure order was narrowly tailored.

## C

The district court characterized its overriding interest as "keeping people safe and limiting the spread of the virus." As the Supreme Court has acknowledged, "[s]temming the spread of COVID-19 is unquestionably a compelling interest." *Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020). Given the impact of the COVID pandemic on Northern California at the time the court was attempting to schedule Allen's trial, we agree that the goal of limiting the transmission of COVID while holding a trial was an overriding interest. *See id.* The parties here do not dispute this. Rather, they focus on the question whether the court's COVID protocols were narrowly tailored.

A courtroom closure is narrowly tailored to a substantial or overriding interest if it is "no broader than necessary to protect that interest." *Waller*, 467 U.S. at 48. In considering whether a burden imposed on a constitutional right is narrowly tailored, the Supreme Court considers, among other things, "different methods that other jurisdictions have found

effective" in addressing the problem "with less intrusive tools." *McCullen v. Coakley*, 573 U.S. 464, 494 (2014). Thus, in determining whether a corrections department had established that it adopted the "least restrictive means of furthering a compelling government interest," in burdening the religious rights of inmates, the Court noted that, "[w]hile not necessarily controlling, the policies followed at other well-run institutions would be relevant to a determination of the need for a particular type of restriction." *Holt v. Hobbs*, 574 U.S. 352, 368 (2015). The Court has also applied this standard in the context of the COVID pandemic. *See Diocese of Brooklyn*, 141 S. Ct. at 67. In *Diocese of Brooklyn*, the Court considered a governor's executive order imposing severe restrictions on attendance at religious services for the purpose of stemming the spread of COVID. The Court determined that the restrictions could not be regarded as narrowly tailored, in part because they were "much tighter than those adopted by many other jurisdictions hard-hit by the pandemic." *Id.*

The existence of reasonable alternatives also sheds light on whether closure restrictions are narrowly tailored. "For instance, instead of closing an entire hearing, a trial court should consider the reasonable alternative of 'closing only those parts of the hearing that jeopardized the interests advanced.'" *Yazzie*, 743 F.3d at 1289 (quoting *Waller*, 467 U.S. at 48). Similarly, "instead of excluding the public from a voir dire of prospective jurors, the trial court should have adopted the reasonable alternative of finding additional space in the courtroom to accommodate members of the public who wished to attend." *Id.* at 1290 (citing *Presley*, 558 U.S. at 215).

In determining whether the district court erred in not adopting less restrictive alternatives here, we begin by considering the policies adopted by other jurisdictions to address COVID issues. *See McCullen*, 573 U.S. at 494. In this context, we consider video streaming to be a less restrictive alternative to audio streaming, because the core of the defendant's Sixth Amendment right is to have his trial open for public attendance and observation. *See supra* Section II.A.**[4]**

Our review of other jurisdictions reveals that the district court's order was "truly exceptional." *McCullen*, 573 U.S. at 490. During the pandemic, federal trial courts throughout the country addressed the same issue as the district court here. These courts (including courts that held trials in late 2020, when the district court held Allen's trial) consistently allowed some form of visual access to the trial, either by allowing the public to view a live video feed of the trial in a separate room in the courthouse, or by allowing a limited number of

---

**[4]** Therefore, we disagree with the court's determination that the difference between audio and video streaming has no constitutional significance. The court's reasoning that telephone access is preferable to video streaming because it is more widely accessible to the public does not take into account that audio streaming fails to satisfy the defendant's basic right to have the public observe the trial.

spectators to be present in the courtroom.**⁵**  Many state courts adopted similar measures.**⁶**

Courts also adopted a range of measures to minimize health risks.  Some courts asked for lists of attendees who wanted to observe the trial, *see Barrow*, 2021 WL 3602859, at *5, or allowed only a small number of public attendees (rather than all interested spectators) to observe the proceedings, *see Lappin*, 171 N.E.3d at 707; *Holder*, 2021 WL 4427254, at *9.  The government argues that Allen asked

---

**⁵** *See United States v. Babichenko*, 508 F. Supp. 3d 774, 778 (D. Idaho 2020) (permitting a separate room in courthouse with live video feed); *United States v. Sapalasan*, 2021 WL 2080011, at *2 (D. Alaska May 24, 2021) (same); *United States v. Barrow*, 2021 WL 3602859, at *5 (D.D.C. Aug. 13, 2021) (same); *United States v. Huling*, 2021 WL 2291836, at *2 (D.R.I. June 4, 2021) (same); *United States v. Akhavan*, 2021 WL 1216909, at *4 (S.D.N.Y. Apr. 1, 2021) (same); *United States v. Gordon*, 2021 WL 1820690, at *2 (W.D. Tex. May 6, 2021) (same); *United States v. Trimarco*, 2020 WL 5211051, at *2 (E.D.N.Y. Sept. 1, 2020) (permitting a limited number of spectators in courtroom and a separate room in courthouse with live video feed); *United States v. Johnson*, 2021 WL 3011933, at *1 (N.D. Ohio July 16, 2021) (same); *United States v. Abdelaziz*, 2021 WL 4295840, at *1 (D. Mass. Sept. 20, 2021) (same); *United States v. Richards*, 2020 WL 5219537, at *1 (M.D. Ala. Sept. 1, 2020) (permitting courtroom access for the defendant's family and separate room in courthouse with live video feed); *United States v. Bledson*, 2021 WL 1152431, at *3 (M.D. Ala. Mar. 25, 2021) (same); *United States v. Fortson*, 2020 WL 4589710, at *2 (M.D. Ala. Aug. 10, 2020) (same); *United States v. Holder*, 2021 WL 4427254, at *9 (D. Colo. Sept. 27, 2021) (permitting limited spectators in courtroom).

**⁶** *See Strommen v. Larson*, 401 Mont. 554 (2020) (denying public trial claim where court allowed live video streaming at a remote location); *Lappin v. State*, 171 N.E.3d 702, 707 (Ind. Ct. App. 2021) (affirming conviction over public trial objection where the trial court gave the public access to *voir dire* proceedings only via audio streaming and allowed a limited number of spectators in the courtroom for trial).

only for video-streaming, and did not request that specified individuals, such as family members or journalists, be allowed to attend the trial. But the district court had an obligation to sua sponte consider alternatives "even when they are not offered by the parties." *Presley*, 558 U.S. at 214. Other courts required members of the public attending a proceeding to pass temperature checks, wear a mask, and answer a health questionnaire. *See Trimarco*, 2020 WL 5211051, at *3.

Each of the alternatives adopted by other courts was "more narrowly tailored and more protective of constitutional rights" than a total closure of the courtroom. *Yazzie*, 743 F.3d at 1289. That other jurisdictions could address the pandemic using more targeted means suggests that the district court here had "too readily forgone options that could serve its interests just as well, without substantially burdening" Allen's public trial right. *McCullen*, 573 U.S. at 490.

In light of the availability of these alternatives, the district court could justify its more restrictive order only if it had some unique reason it could not use video-streaming or other alternatives, despite other courts being able to do so. *Cf. Holt*, 574 U.S. at 368–69 (holding that a security measure burdening prisoners' First Amendment rights was not narrowly tailored when the state failed to show why it could not offer a religious accommodation, even though the vast majority of states and the federal government were able to offer such accommodations). But the court here did not articulate such unique reasons. The district court stated only that live-streaming the video to a different room in the courthouse would not meet the objectives of curbing the spread of COVID, because it would not limit the number of persons in the courthouse. This reasoning fails because the

court had to strike a balance between protecting a defendant's public trial right and the goal of stemming the spread of COVID; "to meet the requirement of narrow tailoring," the court must show that reasonable alternative measures "would fail to achieve the government's interests, not simply that the chosen route is easier." *McCullen*, 573 U.S. at 495. Here the district court cannot show that allowing a limited number of members of the public to view the trial in the courtroom, or via a live-streamed video in a different room, would imperil public health. *See Diocese of Brooklyn*, 141 S. Ct. at 67. Rather, the Supreme Court has indicated that limiting maximum attendance is a reasonable means of minimizing health risks from COVID. *See id.*

When courts order a total closure of the courtroom, "the balance of interests must be struck with special care." *Waller*, 467 U.S. at 45. Because the district court could have "address[ed] its legitimate concerns with rules short of a total ban" on the public's access to the suppression hearing and trial, the district court here failed to strike the appropriate balance. *S. Bay United Pentecostal Church v. Newsom*, 141 S. Ct. 716, 718 (2021) (Gorsuch, J., statement). Therefore, we conclude that in the circumstances presented here, the district court's complete prohibition on the public's visual access to the trial and suppression hearing was not narrowly tailored and, accordingly, violated Allen's Sixth Amendment right to a public trial.

Nevertheless, we emphasize that an order prohibiting the public's visual access to a trial or suppression hearing will not always violate the defendant's public trial right. Certain interests (such as national security) may be so compelling that prohibiting the public's observation of some or all of the proceedings may be warranted. *See Waller*, 467 U.S. at 45

(noting one interest weighing against public trials may be "the government's interest in inhibiting disclosure of sensitive information"). And where a prohibition on the public's presence at a trial or hearing is no broader than necessary to achieve a compelling interest, *see Yazzie*, 743 F.3d at 1287, a transcript or audio recording may be sufficient to satisfy the public trial right, *see Press-Enterprise*, 464 U.S. at 512; *see also United States v. Hendricks*, 950 F.3d 348, 356 (6th Cir. 2020) (holding partial closure was narrowly tailored to substantial interest in protecting FBI counterterrorism agent's safety where trial court excluded public from courtroom during agent's testimony and live-streamed audio of the testimony in a separate room).

## D

Having determined that Allen's Sixth Amendment public trial right was violated, we now must determine the appropriate relief. It is well established that a defendant is not required to prove prejudice to obtain relief for a violation of his public trial right. *Waller*, 467 U.S. at 49–50. As the Supreme Court has explained, "a requirement that prejudice be shown 'would in most cases deprive the defendant of the public-trial guarantee, for it would be difficult to envisage a case in which he would have evidence available of specific injury.'" *Id.* at 49 n.9 (cleaned up). Because "the remedy should be appropriate to the violation," *id.* at 50, a defendant whose right to a public trial was violated is entitled to a new, public proceeding in place of the one that was erroneously closed, *see id.* at 49 (holding that a defendant whose suppression hearing was erroneously closed was entitled to a new suppression hearing, and also a new trial if the subsequent public suppression hearing resulted in the

suppression of evidence not suppressed at the first trial); *Rivera*, 682 F.3d at 1237 (holding that a defendant whose sentencing hearing was erroneously closed was entitled to new sentencing proceedings).

Here, the public could not observe or attend either the suppression hearing or the trial. Accordingly, the only remedy "appropriate to the violation," *Waller*, 467 U.S. at 50, is a new suppression hearing and a new trial. We therefore vacate Allen's conviction and the district court's denial of the motion to suppress, and remand for these proceedings.

**VACATED AND REMANDED**.