*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

UNPUBLISHED
March 28, 2024

Plaintiff-Appellee,

v

No. 361025
Saginaw Circuit Court
LC No. 21-047452-FC

RODERICK DEWAYNE BARNES, JR.,

Defendant-Appellant.

Before: PATEL, P.J., and RICK and FEENEY, JJ.

PER CURIAM.

Defendant appeals as of right his convictions by a jury of second-degree murder, MCL 750.317; felon in possession of a firearm (felon-in-possession), MCL 750.224f; carrying a concealed weapon (CCW), MCL 750.227; and two counts of possession of a firearm during the commission of a felony (felony-firearm), second offense, MCL 750.227b. The trial court, applying a fourth-offense habitual offender enhancement under MCL 769.12, sentenced defendant to two terms of five years' imprisonment for each count of felony-firearm, to two terms of 2 to 15 years' imprisonment for CCW and felon-in-possession, and to 45 to 70 years' imprisonment for second-degree murder. On appeal, defendant contends that the self-defense jury instructions given by the trial court were faulty, that his right to a public trial was violated, that the trial court improperly disallowed questioning of his trial attorney regarding a possible conflict of interest, that offense variable (OV) 9 of the sentencing guidelines was misscored, and that a violation of the 180-day rule occurred. We affirm but remand for the ministerial task of amending defendant's judgment of sentence.

The convictions arose from the shooting death of Ricky Morgan in Saginaw in July 2020. The prosecutor presented evidence that defendant and Morgan got into an acrimonious verbal altercation earlier that month and that this "beef" led to the shooting, which occurred in a line outside a cashier's window at a Sunoco gas station. Defendant contended at trial that he had fired shots that evening in self-defense. Morgan's friend, Tony Martin, was also killed during the shooting incident, and the jury convicted defendant of second-degree murder and felony-firearm, second offense, in connection with Martin's death, as well. The court later ruled that defendant's trial attorney had rendered ineffective assistance of counsel in connection with Martin's shooting

-1-

because counsel did not obtain a ballistics expert to attempt to prove that defendant's gun was not the gun that was used to kill Martin. Accordingly, the court ordered that a new trial was warranted concerning the second-degree murder conviction and the felony-firearm conviction that were associated with Martin.[1] The trial court did not, however, remove these convictions from defendant's January 24, 2022 Judgment of Sentence, and we remand this matter for the ministerial task of correcting that document. See *People v Shipley*, 256 Mich App 367, 379; 662 NW2d 856 (2003).

Defendant first contends that the trial court erred by reading M Crim JI 7.18, which deals with self-defense and the duty to withdraw by a deadly aggressor. He claims that he was not a deadly aggressor because he, at most, displayed his handgun before Morgan started shooting. He also contends that his trial attorney, James Gust, rendered ineffective assistance of counsel by failing to advocate for different self-defense instructions.

"Claims of instructional error are generally reviewed de novo by this Court, but the trial court's determination that a jury instruction is applicable to the facts of the case is reviewed for an abuse of discretion." *People v Dobek*, 274 Mich App 58, 82; 732 NW2d 546 (2007).

"Whether a person has been denied effective assistance of counsel is a mixed question of fact and constitutional law. A judge first must find the facts, and then must decide whether those facts constitute a violation of the defendant's constitutional right to effective assistance of counsel." *People v LeBlanc*, 465 Mich 575, 579; 640 NW2d 246 (2002). A court's findings of fact are reviewed for clear error, and questions of constitutional law are reviewed de novo. *Id*.

To obtain relief on the basis of ineffective assistance of counsel, a party "must show that counsel's performance fell short of [an] . . . objective standard of reasonableness and that, but for counsel's deficient performance, there is a reasonable probability that the outcome of the . . . trial would have been different." *People v Ackley*, 497 Mich 381, 389; 870 NW2d 858 (2015) (quotation marks, citation, and brackets omitted). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. (quotation marks and citation omitted).

M Crim JI 7.18 reads:

> A person who started an assault on someone else [with deadly force / with a dangerous or deadly weapon] cannot claim that [he / she] acted in self-defense unless [he / she] genuinely stopped [fighting / (his / her) assault] and clearly let the other person know that [he / she] wanted to make peace. Then, if the other person kept on fighting or started fighting again later, the defendant had the same right to

---

[1] As explained, while defendant was actually convicted of two additional counts—another second-degree murder and another felony-firearm—regarding Martin's murder, the court granted a new trial regarding these offenses. The judgment of sentence has not been updated to reflect that these convictions were vacated; thus, it reflects seven convictions, when defendant currently stands convicted of only five offenses.

defend [himself / herself] as anyone else and could use force to save [himself / herself] from immediate physical harm.

In arguing that M Crim JI 7.18 should not have been read to the jury, defendant relies primarily on *People v Ogilvie*, 341 Mich App 28; 989 NW2d 250 (2022). In that case, the defendant was convicted of felonious assault after he pointed a gun at his neighbor, Eric Watson. *Id*. at 31-32. The defendant argued that the jury was given improper instructions regarding self-defense. *Id*. at 33. This Court quoted MCL 780.972, a portion of the Self-Defense Act (SDA), MCL 780.971 *et seq*. *Id*. at 36-37. MCL 780.972 states:

> (1) An individual who has not or is not engaged in the commission of a crime at the time he or she uses deadly force may use deadly force against another individual anywhere he or she has the legal right to be with no duty to retreat if either of the following applies:
>
> (a) The individual honestly and reasonably believes that the use of deadly force is necessary to prevent the imminent death of or imminent great bodily harm to himself or herself or to another individual.
>
> (b) The individual honestly and reasonably believes that the use of deadly force is necessary to prevent the imminent sexual assault of himself or herself or of another individual.
>
> (2) An individual who has not or is not engaged in the commission of a crime at the time he or she uses force other than deadly force may use force other than deadly force against another individual anywhere he or she has the legal right to be with no duty to retreat if he or she honestly and reasonably believes that the use of that force is necessary to defend himself or herself or another individual from the imminent unlawful use of force by another individual.

The *Ogilvie* Court stated, "Section 2 of the SDA removed the traditional common-law duty to retreat, so long as the individual engaging in self-defense or defense of others was not committing or had not committed a crime and had a legal right to be where they were when they used force." *Id*. at 37 (quotation marks and citation omitted).[2]

The Court framed the pertinent question in the appeal as follows:

> The core issue is whether defendant's act of pointing a loaded gun at Watson constituted the use of deadly force or the use of nondeadly force. Defendant's trial counsel, the prosecution, and the trial court apparently assumed the act to constitute the use of deadly force, so they agreed the jury should be instructed regarding the

---

[2] In discussing the common law, the Court in *People v Guajardo*, 300 Mich App 26; 832 NW2d 409 (2013), stated that, "[i]n general, a defendant does not act in justifiable self-defense when he or she uses excessive force or when the defendant is the initial aggressor."

use of deadly force in self-defense or in defense of others. The trial court read M Crim JI 7.15, 7.16, and 7.21, which correspond with MCL 780.792(1). [*Id*. at 37.]

The defendant argued that the instructions were improper "because he merely threatened to use deadly force, and a threat of deadly force is not the *use* of deadly force." *Id*. at 38. This Court agreed. *Id*. It stated, in part, that deadly force involves circumstances wherein the probable consequence of the defendant's acts is death. *Id*. The Court concluded that the jury should have been instructed with regard to nondeadly force, in accordance with MCL 780.972(2). *Id*. at 41.

Defendant's reliance on *Ogilvie* in the present case is simply misplaced. Defendant argues that his "act of either showing his firearm or having his hand on his firearm was not the use of deadly force" and that, therefore, the deadly-aggressor instruction from M Crim JI 7.18 should not have been given to the jury. But there is no question in the present case that defendant actually discharged his gun; for that reason, he faced and was convicted of a murder charge.

Again, M Crim JI 7.18 states:

> A person who started an assault on someone else [with deadly force / *with a dangerous or deadly weapon*] cannot claim that [he / she] acted in self-defense unless [he / she] genuinely stopped [fighting / (his / her) assault] and clearly let the other person know that [he / she] wanted to make peace. Then, if the other person kept on fighting or started fighting again later, the defendant had the same right to defend [himself / herself] as anyone else and could use force to save [himself / herself] from immediate physical harm. [Emphasis added.]

Defendant does not dispute that he showed or had his hand on his firearm before the shooting began. As such, he "started an assault on someone else" "with a dangerous or deadly weapon." M Crim JI 7.18. An assault involves putting someone "in reasonable fear or apprehension of an immediate battery." See *People v Lawton*, 196 Mich App 341, 350; 492 NW2d 810 (1992) (quotation marks and citation omitted). At one point in his brief, defendant briefly contends that "merely displaying a firearm is not an assault," but he utterly fails to develop this argument. A defendant may not simply claim error or announce a position and then leave it to this Court to "discover and rationalize the basis for his claims, or unravel and elaborate for him his arguments, and then search for authority either to sustain or reject his position." *People v Kevorkian*, 248 Mich App 373, 389; 639 NW2d 291 (2001) (citation omitted).

Under the circumstances, defendant has not shown instructional error or ineffective assistance of counsel in connection with his self-defense theory.

Defendant also contends that his Sixth Amendment right to a public trial was violated because jury selection was not streamed to the court's YouTube channel and because the audio portion of the stream was stopped for three prosecution witnesses. (The proceedings were being streamed to YouTube because of COVID-19 precautions.) He also contends that defense counsel rendered ineffective assistance by failing to object.

This Court reviews unpreserved issues for plain error affecting substantial rights. *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999), mod on other grounds by *People v King*, ___ Mich ___; ___ NW2d ___ (2023) (Docket No. 162327). Under the plain-error doctrine,

reversal is warranted if a "clear or obvious" error occurred that "affected the outcome of the lower court proceedings." *Id.* And even if this standard is satisfied,

> an appellate court must exercise its discretion in deciding whether to reverse. Reversal is warranted only when the plain, forfeited error resulted in the conviction of an actually innocent defendant or when an error seriously affected the fairness, integrity or public reputation of judicial proceedings independent of the defendant's innocence. [*Id.* at 763-764 (citation, quotation marks, and brackets omitted).]

The United States and Michigan Constitutions provide the right to a public trial. US Const, Am VI; Const 1963, art 1, § 20. The right extends to voir dire. *People v Vaughn*, 491 Mich 642, 653, 665; 821 NW2d 288 (2012). The right is limited, however, and closure can occur at any point under the following circumstances:

> The party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced, the closure must be no broader than necessary to protect that interest, the trial court must consider reasonable alternatives to closing the proceeding, and it must make findings adequate to support the closure. [*Id.* (quotation marks, citations, and brackets omitted).]

Here, the record shows that before stopping the YouTube feed for purposes of voir dire, the court did not engage in the full analysis set forth in the above text from *Vaughn*, which is derived from *Waller v Georgia*, 467 US 39, 48; 104 S Ct 2210; 81 L Ed 2d 31 (1984). Nevertheless, we conclude that when caselaw and the entire record are examined closely, reversal is not warranted under the full application of the plain-error doctrine.

In *Vaughn*, 491 Mich at 665, the Court concluded that the closure of the courtroom during voir dire was a plain error. It also stated that the violation of the right to a public trial is a structural error and added that "our caselaw suggests that a plain structural error satisfies the third *Carines* prong," involving whether substantial rights have been affected. *Id.* at 655, 666. See also *People v Davis*, 509 Mich 52, 74; 983 NW2d 325 (2022) ("Accordingly, the existence of a forfeited structural error alone satisfies the third prong of the plain-error standard, and a defendant need not also show the occurrence of outcome-determinative prejudice."). But the *Vaughn* Court went on to hold that reversal was not required because the closure had not " 'seriously affected the fairness, integrity, or public reputation of judicial proceedings.' " *Id.* at 668-669, quoting *Carines*, 460 Mich at 774. The *Vaughn* Court, in concluding that this final prong of the *Carines* test had not been established, relied to a certain extent on statements from a federal circuit court case, *United States v Gupta* (*Gupta I*), 650 F3d 863 (CA 2, 2011), that has been vacated and superseded on rehearing by *United States v Gupta (Gupta II)*, 699 F3d 682 (CA 2, 2012). See *Vaughn*, 491 Mich at 668. In *Gupta II*, 699 F3d at 690, the court concluded that "the importance of the public trial right dictates that, before closing a courtroom to the public, a trial court must inform the parties of its intentions and make explicit *Waller* findings." It stated that the "[f]ailure to comply with this procedure will, in nearly all cases, invite reversal." *Id.* And it ruled that "[h]ere, the district court's intentional, unjustified exclusion of the public for the entirety of voir dire was neither brief nor trivial." *Id.* at 685. It concluded that reversal was warranted. *Id.* at 690.

At first blush, the issuance of *Gupta II* would seem to undermine the Michigan Supreme Court's analysis in *Vaughn*. But the *Gupta* courts were determining whether a "triviality" exception to the public-trial right applied. See *Gupta I*, 650 F3d at 867, and *Gupta II*, 699 F3d at 690. They were not applying the plain-error analysis from *Carines*. In addition, the decisions of federal circuit courts are not binding on this Court. *People v Walker*, 328 Mich App 429, 444-445; 938 NW2d 31 (2019). The bottom line is that the *Vaughn* Court's basic premise—that an unpreserved public-trial violation is subject to the full plain-error analysis of *Carines*—stands. See also, generally, *Weaver v Massachusetts*, 582 US 286, 300, 304 (opinion of Kennedy, J.), 306 (opinion of Thomas, J.); 137 S Ct 1899; 198 L Ed 2d 420 (2017) (indicating that the closure of a courtroom during voir dire is not automatically unfair).

Arguably, the court in the present case erred by not conducting a full *Waller* analysis before closing the voir dire proceedings. See *Weaver*, *id*. at 298 (opinion of Kennedy, J.) ("A public-trial violation can occur, moreover, . . . simply because the trial court omits to make the proper findings before closing the courtroom, even if those findings might have been fully supported by the evidence."). But even assuming a plain error occurred that affected defendant's substantial rights, we conclude that there was no serious effect on the fairness, integrity, or public reputation of judicial proceedings in this case. *Carines*, 460 Mich at 774.

In *Davis*, 509 Mich at 76, the Michigan Supreme Court indicated that when a forfeited structural error occurs, there is a rebuttable presumption that the "fairness, integrity, or public reputation" prong of the *Carines* analysis has been satisfied. It stated:

> The formal rebuttable presumption in cases of forfeited structural error will shift the burden to the prosecutor to demonstrate that the error did not seriously affect the fairness, integrity, or public reputation of the judicial proceeding. The prosecutor is better positioned to marshal record facts supporting the overall fairness of the trial proceedings. For example, in the context of courtroom closures, a prosecutor may successfully rebut the presumption when the trial court failed to sufficiently articulate the basis for the closure under *Waller*, but sufficient justification for the specific closure was present elsewhere in the record. A prosecutor may also successfully rebut such a presumption when an unjustified closure was limited and the courtroom remained open during most of the critical stages of trial. In those hypothetical situations, specific facts could affirmatively demonstrate that, despite the error, the overall fairness, integrity, and reputation of the trial court proceedings were preserved. [*Id*.]

In the present case, that COVID-19 restrictions were necessary is not disputed. Although the trial court did not articulate an analysis of the *Waller* factors until after defendant filed a motion for a new trial, and although the court's analysis could have been more robust, the record indicates that this was a high-profile murder case that involved the possibility of retaliatory actions. Also, the court was concerned about the jurors' names and information being broadcast to a literally worldwide audience. In addition, no party on appeal argues that anything untoward or nefarious took place during jury selection, and defense counsel expressed satisfaction with the jury. Under these circumstances, the prosecutor has successfully established that reversal is unwarranted in light of the final prong of the *Carines* framework. Moreover, because the voir dire closure was not fundamentally unfair and because defendant has not shown that it affected the outcome of the

-6-

proceedings, defendant has not established his claim of ineffective assistance of counsel. See *Weaver*, 582 US at 304-305 (opinion of Kennedy, J.).

Defendant further takes issue with the court's decision to refrain from broadcasting the video portion of three prosecution witnesses' testimony. We conclude that defendant has not established that a plain error occurred in connection with this action. The prosecutor and court were concerned with witness safety in this contentious and high-profile murder case, and, therefore, the court stopped the video feed, but not the audio feed, during their testimony. Defendant has not set forth authority stating that stopping the video feed of select witnesses amounts to a public-trial violation. He cites *United States v Allen*, 34 F4th 789 (CA 9, 2022), but that case, in addition to being nonbinding, involved a situation wherein the *entire proceedings* were broadcast by way of audio only. See *id*. at 797. The situation in the present case was more narrowly tailored. And in fact, in *Allen* itself, the court stated:

> [W]here a prohibition on the public's presence at a trial or hearing is no broader than necessary to achieve a compelling interest, . . . a transcript or audio recording may be sufficient to satisfy the public trial right . . . ; see . . . *United States v Hendricks*, 950 F3d 348, 356 (CA 6, 2020) (holding partial closure was narrowly tailored to substantial interest in protecting FBI counterterrorism agent's safety where trial court excluded public from courtroom during agent's testimony and live-streamed audio of the testimony in a separate room). [*Allen*, 34 F4th at 800.]

The situation in *Hendricks* is more analogous to what occurred in the present case.[3]

In addition, we note that in *United States v Hougen*, 76 F4th 805, 809-813 (CA 9, 2023), the court ruled that reversal was unwarranted in a case wherein the defendant had not objected to an audio-only feed because there had been no effect on the fairness, integrity, or reputation of judicial proceedings. Under all the circumstances, we conclude that defendant has not established a basis for reversal in connection with the trial court's decision to broadcast only the audio portion of the three prosecution witnesses' testimony.

Defendant contends that his trial attorney's failure to object to the stoppage of the video feed for the three witnesses amounted to ineffective assistance of counsel. Because he has not

---

[3] We note that in *People v Russell*, 297 Mich App 707, 720; 825 NW2d 623 (2012), the Court stated that "the effect of a partial closure of trial does not reach the level of a total closure and only a substantial, rather than a compelling reason for the closure is required." Accordingly, even if broadcasting only the audio portion of select witness testimony is considered a partial closure, only a "substantial" reason would be necessary for such closure. In *Russell*, the Court stated, "The record reveals that the voir dire proceedings were partially closed as a result of the limited capacity of the courtroom. The limited capacity of the courtroom was a substantial reason for the closure, and thus, this partial closure did not deny defendant his right to a public trial." *Id*. Here, the court had a substantial reason for its actions.

shown that the limitation on the feed was violative of his public-trial right, however, he has also not shown that any objection would have been successful.

Defendant also argues that the trial court erred when it ruled that, at an upcoming *Ginther*[4] hearing, defendant's new attorney would not be able to question Gust about the fact that he had represented Devon Morgan (Devon), who was the uncle of Ricky Morgan and who was listed as a prosecution witness. Defendant contends that he should have been allowed a full evidentiary hearing regarding a possible conflict of interest.[5]

"[A] trial court's decision whether to hold an evidentiary hearing is reviewed for an abuse of discretion." *People v Unger*, 278 Mich App 210, 216-217; 749 NW2d 272 (2008). "An abuse of discretion occurs when the court chooses an outcome that falls outside the range of reasonable and principled outcomes." *Id.*

In arguing that an evidentiary hearing was required to explore a potential conflict of interest, defendant relies primarily on *Wood v Georgia*, 450 US 261; 101 S Ct 1097; 67 L Ed 2d 220 (1981). In *Wood*, the United States Supreme Court stated that, "[w]here a constitutional right to counsel exists, our Sixth Amendment cases hold that there is a correlative right to representation that is free from conflicts of interest." *Id.* at 271. The petitioners in *Wood* were convicted of distributing obscene materials and were sentenced to periods of probation. *Id.* at 262. Their periods of probation were revoked when they failed to make payments toward their fines. *Id.* at 263-264. They indicated that they could not afford the fines and had expected their employer, the owner of an adult bookstore and adult theater, to pay the fines for them. *Id.* at 264 & n 3. All three petitioners were represented by a single lawyer that their employer retained. *Id.* at 266. The petitioners argued that it was unconstitutional under the Equal Protection Clause to "imprison a probationer solely because of his inability to make installment payments on fines." *Id.* at 264. The Court stated:

> For some reason, . . . the employer declined to provide money to pay the fines in the cases presently under review. Since it was this decision by the employer that placed petitioners in their present predicament, and since their counsel has acted as the agent of the employer and has been paid by the employer, the risk of conflict of interest in this situation is evident. The fact that the employer chose to refuse payment of these fines, even as it paid other fines and paid the sums necessary to keep petitioners free on bond in this case, suggests the possibility that it was seeking—in its own interest—a resolution of the equal protection claim raised here. If offenders cannot be jailed for failure to pay fines that are beyond their own means, then this operator of "adult" establishments may escape the burden of paying the fines imposed on its employees when they are arrested for conducting its business. To obtain such a ruling, however, it was necessary for

---

[4] *People v Ginther*, 390 Mich 436, 443; 212 NW2d 922 (1973).

[5] The court allowed the hearing for other topics.

petitioners to receive fines that were beyond their own means and then risk jail by failing to pay.

> Although we cannot be sure that the employer and petitioners' attorney were seeking to create a test case, there is a clear possibility of conflict of interests on these facts. Indications of this apparent conflict of interest may be found at various stages of the proceedings below. It was conceded at oral argument here that petitioners raised no protest about the size of the fines imposed at the time of sentencing. During the three months leading up to the probation revocation hearing they failed to pay even small amounts toward their fines to indicate their good faith. In fact, throughout this period, petitioners apparently remained under the impression that—as promised—the fines would be paid by the employer. Even at the revocation hearing itself, petitioners attempted to prove their inability to make the required payments but failed to make a motion for a modification of those requirements. That motion was not made until one day before petitioners were due to be incarcerated. A review of these facts demonstrates that, if petitioners' counsel was serving the employer's interest in setting a precedent, this conflict in goals may well have influenced the decision of the trial court to impose such large fines, as well as the decisions to revoke petitioners' probations rather than to modify the conditions. [*Id*. at 267-268.]

The Court stated that the third-party fee arrangement was suggestive of potential unfairness and that the "potential for injustice" was "serious." *Id*. at 270-271. It stated that the possibility of an actual conflict of interest "was sufficiently apparent at the time of the revocation hearing to impose upon the court a duty to inquire further" and hold a hearing. *Id*. at 272-273.

> The present case is distinguishable from *Wood*. In *Wood*, there were ample indications that an actual conflict existed. Here, defendant states that Devon might have had information favorable toward defendant's defense, given that the prosecutor did not, in the end, call him as a witness and speculates that Gust could not disclose this information because of client confidentiality with Devon. But subsequent defense counsel stated at oral arguments that someone had said "that Ricky Morgan called Devon . . . and said that my client murdered [sic] him." In addition, it was not disputed that defendant shot Morgan; rather, the case hinged on defendant's claim of self-defense. Under these circumstances, the prosecutor had no need to call Devon as a witness. No abuse of discretion is apparent with regard to the trial court's failure to grant an evidentiary hearing on the conflict-of-interest issue.[6]

---

[6] In *People v Smith*, 456 Mich 543, 556; 581 NW2d 654 (1998), the Court stated that "in order to demonstrate that a conflict of interest has violated his Sixth Amendment rights, a defendant must establish that an actual conflict of interest adversely affected his lawyer's performance." (Quotation marks and citation omitted.) The upshot of the trial court's ruling was that defendant had not made a sufficient offer of proof indicating that a full evidentiary hearing was warranted on the conflict-of-interest issue.

Defendant next argues that the trial court's decision to assess 10 points for OV 9 of the sentencing guidelines, concerning the number of victims placed in danger of death or physical injury, was erroneous. We disagree.

"Under the sentencing guidelines, a trial court's findings of fact are reviewed for clear error and must be supported by a preponderance of the evidence." *People v Thompson (On Remand)*, 314 Mich App 703, 708; 887 NW2d 650 (2016). Clear error occurs when this Court is left with a firm and definite conviction that an error has taken place. *Id*. This Court reviews de novo whether the facts as found were adequate to satisfy the statutory scoring conditions. *Id*.

MCL 777.39(1)(c) states, in pertinent part, that 10 points are to be assessed for OV 9 if "there were 2 to 9 victims who were placed in danger of physical injury or death[.]" MCL 777.39(2)(a) states, "Count each person who was placed in danger of physical injury or loss of life or property as a victim."

After the court vacated the conviction relating to the murder of Martin, it allowed briefing and arguments regarding whether OV 9 should be rescored. Defendant's attorney acknowledged that the shooting of Martin was not yet considered "acquitted conduct" because the court merely ordered a new trial regarding his death. But counsel argued that only one person—Morgan—had been placed in danger of physical injury or death and that, therefore, zero points should be assessed for OV 9. The court concluded that Martin had been placed in danger during the shooting and that an assessment of 10 points for OV 9 was appropriate.

Defendant admits on appeal that Martin was standing next to Morgan at the time of the shooting. Clearly, Martin was placed in danger of physical injury or loss of life when defendant, during the chaotic moments of the crime, was shooting at a person next to Martin. A person's close proximity to a physically dangerous situation can be sufficient to count that person as a victim. *People v Rodriguez*, 327 Mich App 573, 582; 935 NW2d 51 (2019). Contrary to defendant's implication, the counting of Martin as a victim was not a matter of "count[ing] the victims of uncharged or dismissed offenses," cf. *People v Pennell*, 507 Mich 993; 960 NW2d 527 (2021), because Martin was a victim *in connection with the shooting of Morgan by virtue of physical proximity*. No scoring error is apparent.

Defendant, in a supplemental brief filed *in propria persona*, alleges a violation of the 180-day rule. Notably, defendant did not raise this issue below; hence, it is not preserved. Accordingly, we review this issue for plain error affecting substantial rights, *Carines*, 460 Mich at 763. Defendant contends that a violation of the 180-day rule[7] occurred because the Department of Corrections sent notice of a pending warrant on January 23, 2023, meaning that action on the warrant needed to be commenced by July 2023. The notice he attaches to his brief does indeed contain the date of January 23, 2023. It also reflects that defendant was serving sentences for the offenses involved in this very case and indicates that those same charges were the subject of a "pending warrant." The notice is defective and possibly pertains to a potential retrial on the charges relating to Martin's shooting. Clearly, the notice does not pertain to defendant's trial for the crimes at issue on appeal as that trial occurred in November 2021. No entitlement to any relief

---

[7] See MCL 780.131(1) and MCL 780.133.

is apparent.  We remand the case to the trial court, however, for the ministerial task of correcting the January 24, 2022 Judgment of Sentence to omit the additional second-degree murder conviction and the additional felony-firearm conviction associated with Martin's death. We do not retain jurisdiction.

Affirmed.

/s/ Sima G. Patel
/s/ Michelle M. Rick
/s/ Kathleen A. Feeney