Filed 12/16/22  P. v. Flowers CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>MICHAEL DENNIS FLOWERS,<br><br>        Defendant and Appellant. | A163739<br><br>(Humboldt County<br>Super. Ct. No. CR2001175B) |

Defendant Michael Dennis Flowers appeals the judgment convicting him of rape, sexual penetration and acquiring a prostitute, and sentencing him to a total term of 160 years to life in prison. He contends, among other things, that the trial court violated his right to a public trial, unlawfully restricted his right to cross-examine the complaining witness, abused its discretion in admitting evidence of his prior sexual offenses, improperly instructed the jury on the use of propensity evidence, and erred in concluding the prosecution had no duty to subpoena the complaining witness's cell phone. He also contends two 5-year terms imposed under Penal Code section 667, subdivision (a), must be stricken and the matter must be remanded for resentencing because he was not properly advised of the penal consequences of his admission to the three-strike sentence enhancement allegations. We agree that the two 5-year prison terms must be stricken, but affirm the judgment in all other respects.

1

## Background

Defendant was charged by amended information with forcible rape (Pen. Code,[1] § 261, subd. (a)(2)), sexual penetration by foreign object (§ 289, subd. (a)(1)(A)), and acquiring a prostitute (§ 266e). With respect to the first two counts, the information alleged that defendant had suffered a prior sex offense that resulted in a prior prison term (§ 667.6, subd. (a)); was a habitual sex offender (§ 667.71); and had previously committed a serious or violent felony while on state parole (§ 1203.085, subd. (b)). Regarding the final count, the information charged that defendant committed the offense while on parole following a term of imprisonment imposed for having committed an earlier serious or violent felony (§ 1203.085, subd. (a)). As to all three counts, the information alleged that defendant had suffered a prior conviction within the meaning of section 1203, subdivision (e)(5), and had suffered three prior serious or violent felony convictions within the meaning of section 667, subdivision (b).

At trial, Jane Doe testified that in February 2020 she was living with George Feack at his home.[2] On February 21, 2020, Jane Doe was inside Feack's home when she overheard a phone conversation between Feack and defendant in which they discussed her prostituting herself. When she indicated that she was not a prostitute, Feack told her to shut up and continued his conversation with defendant.

Later that day, she went for a drive with Feack and ended up at defendant's home. She asked Feack what they were doing there and told him that she " '[didn't] want to do this," but Feack reassured her that the visit had

---

[1] All statutory references are to the Penal Code unless otherwise noted.

[2] At trial, Jane Doe testified that she was being kept in Feack's trailer against her will. Witnesses called by the defense challenged her testimony.

nothing to do with the earlier phone call and that defendant just wanted to have dinner with them. Once inside, the three talked for a while and then Feack asked her if she wanted to take a shower while she was there because the water did not work at his home. While she was showering, defendant came into the bathroom and gave her some clean clothes to wear. When she returned to the main room, she saw that Feack was gone and that the couch had been pulled open to a bed.

Jane Doe told defendant that she was not "a hooker or a prostitute or anything like that." Defendant did not care and told her to get on the bed. She complied because she felt "scared" and "defeated," and she thought it was "a losing battle" at that point. She "already knew what he wanted to happen, so [she] knew what was [going to] happen." Once Jane Doe was on the bed, defendant raped her and placed his hand into her vagina and anus. She did not consent to any of these sexual acts, and she repeatedly told defendant "No." Afterward, defendant gave her $40 and told her to give the money to Feack as the remainder of his payment for her. He told her that he had given Feack $60 before Feack had left as partial payment. Defendant then drove her back to Feack's home. Before she got out of defendant's truck, he asked her to send him pictures of her. After Feack also reminded her about sending the pictures, she sent the pictures to defendant. The next morning, she received an unwanted "good morning" text message from defendant. At Feack's direction, she responded with "good morning."

Jane Doe did not immediately report the assault to the police because she did not want to be embarrassed about what happened. Later, however, she told another male friend about it, who then reported it to the police. When she first spoke with the police, she lied and denied that the assault had

3

occurred. Later the same day, after prompting by her friend, she returned to the police station and gave her account of the assault.

On cross-examination, Jane Doe acknowledged that she had engaged in consensual sexual relations with Feack both before and after defendant's assault. She also admitted that she used heroin and had at times been addicted. Finally, she acknowledged that it was possible that defendant gave Feack $40 and her $60, but that either way she was told to give Feack the second payment when she returned to Feack's home.

Police detectives testified regarding their interviews with Jane Doe, defendant, Feack, and other witnesses.

The prosecution also introduced evidence that defendant had been convicted in the early 1990s of three counts of continuous sexual abuse of a minor arising from his molestation of three of his four stepdaughters (Doe M., Doe V., and Doe C.) who were all ages 10 or under at the time of the abuse. Over defendant's objection, each stepdaughter testified to the molestation that occurred during the time defendant lived with them.

Defendant did not testify on his own behalf. He did call multiple witnesses to support his defense that the assault was part of a consensual encounter between himself and Jane Doe, who he asserted was a prostitute. Sadie E., who had been a good friend of Feack for over 40 years, testified that Jane Doe told her prior to the assault that she was interested in becoming a prostitute and that she had exchanged sex for money previously. Feack testified that Jane Doe had told him about having sex with another unidentified man for money. He further claimed that Jane Doe had wanted him to drive her to defendant's trailer so she could prostitute herself. He claimed that defendant gave him $40 for gas for driving Jane Doe to defendant's home.

4

The jury found defendant guilty of all three charges. In a bifurcated proceeding, defendant admitted all of the enhancement allegations.

Defendant was sentenced to prison for an aggregate term of 160 years to life and timely filed a notice of appeal.

**Discussion**

1. *The court did not violate defendant's right to a public trial.*

Defendant's trial, which occurred during the covid pandemic, was live streamed via YouTube. Over defendant's objection, during the testimony of Jane Doe and the three victims of defendant's prior sexual offenses, the video portion of the broadcast was adjusted so that only the judge was visible. On appeal, defendant contends his convictions must be reversed because the court violated his right to a public trial by broadcasting only the audio testimony of these witnesses. We disagree.

A criminal defendant has a right to a public trial that is guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and by article 1, section 15 of the California Constitution. (*Waller v. Georgia* (1984) 467 U.S. 39, 46; *People v. Woodward* (1992) 4 Cal.4th 376, 382.) " ' " 'The requirement of a public trial is for the benefit of the accused; that the public may see he is fairly dealt with and not unjustly condemned, and that the presence of interested spectators may keep his triers keenly alive to a sense of their responsibility and to the importance of their functions.' " ' " (*Waller, supra*, at p. 46.) "In addition to ensuring that judge and prosecutor carry out their duties responsibly, a public trial encourages witnesses to come forward and discourages perjury." (*Ibid.*) The right to a public trial creates a "presumption of openness" that " 'may be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest.' " (*Id.* at p. 45.) When such a

"'higher value" is advanced, it must be " 'articulated along with findings specific enough that a reviewing court can determine whether the closure order was properly entered.' " (*Ibid*.)

Here, prior to opening argument, the prosecutor requested that "each of the confidential victims during the course of the jury trial not be filmed during the course of their testimony and broadcast via YouTube." The prosecutor acknowledged that "what they're saying will be heard" but argued that "to have their physical appearance broadcast is clearly something that would violate their confidentiality interests." The court did not initially place a ruling on the prosecutor's request on the record. Prior to Jane Doe's testimony, the court confirmed with the prosecutor that the request extended to both the prior victims and Jane Doe. At the first break in Jane Doe's testimony, the court indicated that it needed "to put some matters on the record then, and specifically those are as to the bench conferences with the court." The court explained that the trial was being livestreamed but that, at the prosecutor's request, Jane Doe was not being shown on the video. The court allowed the parties to make a statement for the record and explained its ruling.

The prosecutor argued, "Clearly, Mr. Flowers is being provided his confrontation rights. He is present here represented by counsel. The witness is testifying within the usual course. Jane Doe is a victim of rape and she does have statutorily recognized confidentiality rights . . . . The impact on a rape victim of having his or her testimony live streamed, just the verbal aspect is significant in itself. To also have live stream via YouTube of his or her physical presentation is a direct violation of their confidentiality rights. [¶] . . . I recognize that we're dealing with very unusual circumstances and the court does have a need to address the public aspect of a trial. I think that

6

is clearly being met via the YouTube live streaming of the oral testimony being provided. However, under unusual circumstances, which certainly wouldn't have anyone absent a significant weighing of various factors in the particular request, there wouldn't be any sort of recording or live streaming or photography, anything of that nature, in particular of a rape victim. [¶] So the People made the request that the Jane Does in this matter, both those for the adjudicated offenses and for the ones that are presently being addressed via this trial, not be subjected to the live streaming of their female appearance during the course of the trial."

Defense counsel acknowledged that Jane Doe is an alleged rape victim but argued that "there's a presumption that the courts in this country are open. I think it's a core value of our judicial system. It only seems appropriate that all aspects of the trial be available to the public. It just so happens we're under unusual circumstances. And, yes, there's a certain level of intrusiveness. But as I indicated at bench, I think that is a small part of a larger equation."

The court responded that it was going to continue to maintain the camera angle so that Doe and the prior victims could not be seen. The court explained, "I'll start here. That the courtroom is presumed to be open. It is a public courtroom, and the court needs to honor any transparency that's appeared to the public in viewing the proceedings, and so that's what we're doing. We're . . . in somewhat unusual circumstances permitting the viewing of the proceedings to the public. And we're continuing to maintain that because we have an open mic and we also have viewing of the courtroom. It's a limited viewing of the courtroom, and unfortunately right now it's just me pretty much. But my intent also would be to balance that with the impact upon the victim. The victim in this particular matter is statutorily entitled to

confidentiality. That's why we refer to the victim as Jane Doe. And as far as that -- the necessity of placing her visage before the public by way of a live streaming, I don't have any request for any kind of filming or otherwise that would be requiring a Rule 1.150 kind of filing or request. I don't have anything like that. We are live to the public, and I think the means by which the court has positioned the camera continues to, with that in mind, maintain the confidentiality of the victims who have requested their statutory right to confidentiality."

Initially, defendant contends that his public trial rights were violated during Jane Doe's testimony because "the court unilaterally and without notice to the defense controlled and directed the camera and live feed to itself so that when Jane Doe began her testimony the public could not view her but only hear her testimony." The record refutes his claim. As set forth above, the court, prosecutor and defense counsel all acknowledged that the prosecutor's request regarding the live stream was discussed off the record prior to Jane Doe's testimony. That the matter was put "on the record" after Jane Doe started her testimony does not establish that the decision was made unilaterally and without notice to defendant.

Defendant also argues that while the court "recognized a 'presumption' of openness," the court's comments demonstrate its "ignorance" of the principles that support that presumption. In support of his argument, defendant relies on the following colloquy between the court and defense counsel: "[DEFENSE COUNSEL]: . . . First and foremost, Ms. Doe is an alleged rape victim. I'll make that clear for the record. . . .[¶] [THE COURT]: And just so that's clear, we're not referencing her in front of the jury as a victim or a rape victim. So making that clear. [The prosecutor] is doing that only before the court for the purpose of this argument. [¶] But, yes, go ahead.

8

[¶] [DEFENSE COUNSEL]: Sure. At the same time, we're live streaming, so it's significant for Mr. Flowers. [¶] [THE COURT]: They're not the jury. [¶] [DEFENSE COUNSEL]: That's true." Contrary to defendant's suggestion, the court's comment that the viewers are "not the jury" does not demonstrate a misunderstanding of the import of defendant's public trial right. The court was merely noting that referring to Jane Doe as a victim before anyone watching the livestream was not the same as referring to her as a victim in front of the jury.

Finally, defendant argues that the court erred in concluding that the witnesses' confidentiality rights outweighed his right to a public trial. In *United States v. Allen* (9th Cir. 2022) 34 F.4th 789, 797, the court explained that the test for "determining whether a particular closure order violates a defendant's public trial right changes depending on whether the courtroom closure is total or partial. A total closure of the courtroom means that 'all persons other than witnesses, court personnel, the parties and their lawyers are excluded for the duration of the hearing' [citation]. A partial closure means the court has excluded only a limited number of persons from the courtroom, either for the duration of the proceeding or for a limited period of time (such as during one witness's testimony). [Citation]. [¶] Before ordering a total closure, the court must determine that there is 'an overriding interest based on findings that closure is essential to preserve higher values.' [Citation.] If there was only a partial closure, there must be a substantial interest, rather than an overriding interest, for the closure."

In *United States v. Allen, supra,* 34 F.4th at page 797, the court held that the trial court's decision to preclude the public from attending the trial as a result of the Covid-19 pandemic and to allow only audio access of the trial resulted in the total closure of the defendant's trial. The court explained

9

that "[f]or purposes of the public trial right, an audio stream is not substantially different than a public transcript," which has consistently been found insufficient to protect a defendant's public trial right. (*Id.* at p. 796, citing *Waller v. Georgia, supra,* 467 U.S. at p. 43 [holding that a defendant's public trial right was violated even though the district court released a transcript of the closed proceedings to the public].) We disagree that there is no significant difference between livestreamed oral testimony and a transcript. "[T]ranscripts of testimonial evidence" fail to "fully reflect what was communicated by the testifying witness" because they "cannot capture the sweaty brow, the shifty eye, the quavering voice." (*In re Schoenfield* (2d Cir. 1979) 608 F.2d 930, 935.) Livestreaming oral testimony, however, allows the listener to hear the witness's voice, any pauses or sobs and to evaluate the volume and confidence with which she testifies. Thus, we question whether it is accurate to characterize the courtroom as closed when all testimony was contemporaneously livestreamed to the public. [3] In any event,

---

[3] The Attorney General's argument that the closure was only partial since it applied only to the testimony of certain witnesses mischaracterizes the distinction. Whether a closure is total or partial turns on whether some or all of the public is excluded from the courtroom. (*People v. Esquibel* (2008) 166 Cal.App.4th 539, 552 ["[T]here are two types of exclusions: a total closure where all spectators are directed to leave the courtroom and a partial closure where some, but not all, spectators are asked to leave."].) In each of the cases cited as examples of partial closures only some members of the public were excluded. (See *People v. Woodward, supra,* 4 Cal.4th at p. 381 [exclusion of "additional spectators" but not preexisting spectators]; *People v. Bui* (2010) 183 Cal.App.4th 675, 679 [exclusion of "three spectators, including two family members"]; *People v. Esquibel, supra,* at p. 552 [exclusion of two spectators].) In this case, if livestreaming audio is deemed the closure of the courtroom, the closure would be considered total as all members of the public were excluded.

even if so considered, the order was narrowly tailored and essential to protect the witnesses' overriding privacy interests.

Jane Doe and the prior victims have certain rights under the Victims' Bill of Rights Act of 2008. (Cal. Const., art. I, § 28, subd. (a)(3) [enumerated rights are "personally held and enforceable" by victims].) Victims of crimes are "[t]o be treated with fairness and respect for his or her privacy and dignity, and to be free from intimidation, harassment, and abuse, throughout the criminal . . . justice process" and "[t]o be reasonably protected from the defendant and persons acting on behalf of the defendant." (Cal. Const., art. I, § 28, subd. (b)(1) & (2).) Ordinarily the assertion of these witnesses' "confidentiality rights" would not shield the witnesses from testifying in open court. (See, e.g., *People v. Baldwin* (2006) 142 Cal.App.4th 1416, 1421 [closing courtroom during testimony of 14-year-old molestation victim based only on prosecutor's assertion of victim's discomfort violated defendant's Sixth Amendment right to public trial.) The circumstances in which this ruling were made, however, are far from ordinary.

Defendant's trial was held in March 2021. At that time, the trial court remained under orders restricting in-person access by members of the public to trial proceedings and permitting the use of available technology to conduct remote judicial proceedings. (See <https://newsroom.courts.ca.gov/covid-19-news-center/court-emergency-orders>; <https://www.courts.ca.gov/documents/appendix_I.pdf>; <https://www.humboldt.courts.ca.gov/system/files?file=01-22-2021-press-release-attached-implementation-order.pdf>; <https://www.humboldt.courts.ca.gov/system/files?file=implementation-order-

11

03-22-2021.pdf> [all links as of Dec. 16, 2022].)[4] The decision to livestream defendant's trial on YouTube was a reasonable means of protecting defendant's right to a public trial under these circumstances. Livestreaming, however, undeniably expands the potential audience, permanence, and reproducibility of the testimony, and limits the judge's ability to manage the courtroom. As the trial court observed, there are rules that govern when cameras may be used in a courtroom. (See Cal. Rules of Court, rule 1.150; *People v. Dixon* (2007) 148 Cal.App.4th 414, 440 ["Although the public has a legitimate interest in these cases, its interest can be protected without the additional intrusion of a camera in a proceeding that invokes mostly sensitive information, including . . . testimony from adult and minor victims of sex crimes."].) The court has no such control over a livestream. The court expressly noted that it "knows that there have been instances of recording — an unauthorized recording of YouTube videos of court proceeding[s]."[5]

Defendant contends the court erred by failing to conduct a hearing at which the witnesses could personally express their privacy concerns regarding the livestream. He argues that the witnesses "never asserted that they could not physically or mentally testify" if their appearance was broadcast on YouTube or that they would refuse to testify if the court denied

---

[4] Effective June 23, 2021, the Humboldt County Superior Court reopened for public trials and ended its practice of broadcasting trials on YouTube.

[5] The court's comment was made in connection with its ruling closing the livestream during the pretrial hearing on the admissibility of the prior victims' testimony under Evidence Code section 1108. The court and parties agreed that the testimony should not be live streamed because it might taint the jury pool should the evidence ultimately be excluded. The potential unauthorized recording of trials livestreamed on YouTube is thus relevant to the privacy concerns being balanced by the court.

the prosecutor's request. There is, however, no requirement the trial court hold an evidentiary hearing before closing proceedings. (*People v. Baldwin, supra*, 142 Cal.App.4th at p. 1422.) Nor is there a requirement that the court make findings that the witness would be unable or unwilling to testify absent the restriction. Rather, the court must identify the compelling interest that would likely be prejudiced if the proceedings were open without restriction, and articulate the reasons for its ruling sufficient to permit appellate review. The protection of victims of sex crimes "from further trauma and embarrassment" is a compelling interest deserving of protection. (*Baldwin, supra*, at p. 1421, citing *Globe Newspaper Co. v. Superior Court* (1982) 457 U.S. 596, 607.) The court found that interest was likely to be prejudiced as a result of the court's inability to control certain aspects of the livestream. No further evidence was necessary for the court to evaluate the competing interests at stake. In the circumstances of this case, the court did not err in failing to hold a separate evidentiary hearing.

The increased intrusion into the witnesses' privacy occasioned by the livestreaming of their testimony was an overriding interest that made limited closure essential. This is undoubtedly true with respect to defendant's prior victims. Because defendant was convicted of the prior offenses, any concern regarding their truthfulness was negligible but their interest in protecting their privacy was significant. While the balance may be somewhat closer with regard to Jane Doe, we nonetheless agree that her interest in protecting her privacy was sufficient to overcome defendant's interest in a fully public trial.

Contrary to defendant's argument, the closure was narrowly tailored. Although the oral livestream had its limitations, it was undoubtedly preferable to a transcript because, as discussed above, it offers listeners significant means of evaluating the credibility of the witnesses. (See *Lappin*

*v. State* (2021) 171 N.E.3d 702, 707 [limiting livestream of trial proceedings during voir dire to audio only in order to protect the privacy interests of the venire panel was reasonable accommodation in light of global pandemic].) Defendant faults the court for failing to consider sua sponte other alternatives, including the use of closed-circuit video to broadcast the witnesses' testimony in an unused courtroom. Because this alternative was not raised, it is not possible on this record to determine the feasibility of this suggestion. Given the circumstances, the court implemented a reasonable and narrowly tailored alternative to the traditional public trial.

Accordingly, the trial court did not violate defendant's right to a public trial.

2. *The court did not prejudicially limit defendant's cross-examination of Jane Doe.*

"A criminal defendant's constitutional right to confront witnesses is violated when the court prohibits the defendant from conducting otherwise appropriate cross-examination designed to show a prototypical kind of bias on the witness's part, and thereby provide the jury with facts from which it could appropriately draw inferences regarding the witness's reliability." (*People v. Sanchez* (2016) 63 Cal.4th 411, 450.) This includes cross-examination regarding whether and to what extent the witness "expected or hoped" to benefit from his or her testimony. (*Id*. at p. 451.)

Here, prior to trial, defendant filed a motion to confirm that Jane Doe would be subject to cross-examination regarding an incident that occurred in September 2020 during which she was detained by the police based on a report that she had been shoplifting and that during that incident the police seized methamphetamine and heroin from her purse. Defendant sought to cross-examine her regarding, among other things, "[t]he existence or nonexistence of a bias, interest, or other motive." (Evid. Code, § 780,

14

subd. (f).) The motion explained, "The People advised that no charges were filed, but the *de facto* arrest at Ray's Food is still within the one-year time period in which charges could be brought. Defense counsel is entitled to ascertain whether any member of the prosecutorial team made any promises, assurances, or inducements to Ms. Doe (however described) regarding whether or not she was effectively given a 'pass.' " In arguing the motion, defense counsel emphasized, "I'm not pointing fingers at anybody here or saying I know what happened. Frankly, it didn't happen. The prosecution didn't happen. And I think a jury should have the ability to know about that in order to infer whether or not there's an attempt to sanitize Ms. Doe and, therefore, have her credibility more impacted before . . . Mr. Flowers come[s] before a jury." The court ruled that Jane Doe could be cross-examined regarding the theft incident and her related possession of heroin. The court, however, prohibited defense counsel from asking Jane Doe whether she was ever prosecuted for those possible crimes. The court explained, "I'm not going to allow some kind of foray into speculation about the People's motivation in charging or not charging this particular incident. . . . [¶] I would assume that if there's some consideration given for not prosecuting her on that, [the prosecution would] comply with [its] discovery obligation and let [the defense] know. And that's not the case here, so we're not going to go into it for some kind of exploration of the People -- the People providing her some undue consideration or consideration whatsoever for her testimony."

Prior to commencing his cross-examination of Jane Doe, defense counsel sought to make a record of his objection. Counsel stated, "I was intending to inquire of her a very simple point-blank question without detail, which is whether she was ever prosecuted for that crime. And the court has indicated that it would preclude me from asking that question, and I just

15

want to lodge my objection on the record." The court reiterated its ruling noting, "Well, obviously the question, the added question, would be for the purposes of inferring at least that Ms. Doe is receiving some sort of preferential treatment or otherwise by the People. I simply don't have any evidence of that. [¶] And in balancing the inquiry under Evidence Code section 352, I do think that misapprehension given the fact that there's no evidence and there's no indication that she's receiving any other kind of dispensation for her testimony, obviously that would be discoverable. People would be duty bound, ethically bound, to disclose that if there was some sort of remuneration or dispensation given for her testimony. So they have not done that. [¶] And so I'm weighing the prejudicial value versus the probative effect of that particular question. I am permitting -- and there was an inquiry -- and I appreciate that -- an inquiry whether we would be -- defense would be allowed to go into the theft incident and the discovery of heroin, and I indicated that, yes, we -- that defense would be able to inquire into both of those areas. I think we've made a record of that already. . . . So I'm gonna leave it at that, and I'll preclude the inquiry relative to any kind of prosecution for those offenses."

Despite the court's ruling, the fact that Jane Doe was never prosecuted came out during the course of cross-examination. Doe testified that, in September 2020, she "came in contact" with the police because she was suspected of shoplifting. On cross-examination, when defense counsel attempted to question her about her "arrest," Doe responded that she had "never been arrested. There was a citation." When counsel sought to confirm that she received a citation for petty theft, Doe replied, "Yes. It was thrown out." She then repeated, "It was thrown out." She added, "I was never charged" and have "never been arrested in my life." Defense counsel then

confirmed that when the police issued the citation, they found heroin and methamphetamine in her purse. When asked if she was prosecuted for that, Doe replied, "No, sir."

On appeal, defendant contends the trial court impermissibly restricted his cross-examination of Jane Doe by prohibiting "inquiry into Doe's motivation to accuse and testify that [he] sexually assaulted her." The Attorney General reasonably responds that any possible error in the court's pretrial ruling "was harmless because the question was ultimately asked and answered anyway." In his reply, defendant suggests the Attorney General is reading the court's ruling too narrowly and that "the court's ruling was much broader." He argues that the court "prohibited inquiry of Doe as to the *reason* for the failure-to-charge and whether the failure to charge acted as an *inducement* to testify and affected the *content* of her testimony." He continues, "The fact counsel specifically objected to not being able to ask a specific question does not constitute adoption of the court's entire ruling which not only prohibited the question but cut-off inquiry as to how the failure to prosecute affected Doe's decision to testify and her actual testimony."

For the most part, we agree with the Attorney General's interpretation of the record. The record contains no indication that defense counsel expressed a desire to ask Jane Doe whether she subjectively believed the lack of prosecution was related to her testimony in this case. As set forth above, in arguing the in limine motion to the court, defense counsel focused on the fact that the case was referred by police to the prosecutor's office, but the prosecution decided not to charge the case. The prosecutor explained that she was not the "reviewing deputy" on the shoplifting report and that the matter would have been reviewed and rejected by someone with "no independent

17

knowledge of Jane Doe's involvement" in defendant's case. The trial court correctly noted that the prosecution would have been required to disclose any promises made by the prosecution in relation to Jane Doe's testimony. Absent a factual basis to believe some inducement had been made by the prosecutor, the court reasonably limited the scope of cross-examination under Evidence Code section 352.

3. *The court did not abuse its discretion in admitting testimony regarding defendant's prior sex offenses.*

As noted above, evidence was introduced that defendant had three prior convictions for the continuous sexual abuse of a minor and his three victims were permitted to testify as to the details of defendant's abuse. Defendant does not challenge the admission of his prior convictions but claims that the trial court committed reversible error when it allowed the victims to testify as to the details of the abuse. He argues that the victims' testimony was erroneously admitted under Evidence Code sections 1108 and 352 because it was irrelevant, remote and inflammatory propensity evidence.

As a general rule, evidence of a person's character is inadmissible to prove conduct on a specific occasion. (Evid. Code, § 101, subd. (a).); *People v. Ewoldt* (1994) 7 Cal.4th 380, 393.) Thus, evidence of other crimes or bad acts is generally inadmissible when offered to show a defendant had the criminal disposition or propensity to commit the crime charged. (*Ibid.*)

Evidence Code section 1108 creates an exception to this general rule by expanding the admissibility of disposition or propensity evidence in sex offense cases. (*People v. Falsetta* (1999) 21 Cal.4th 903, 911.) Subdivision (a) of section 1108 provides that "[i]n a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by Section 1101, if the evidence is not inadmissible pursuant to [Evidence Code section] 352." As the

18

Supreme Court explained in *Falsetta*, section 1108 of the Evidence Code "was intended in sex offense cases to relax the evidentiary restraints section 1101, subdivision (a), imposed, to assure that the trier of fact would be made aware of the defendant's other sex offenses in evaluating the victim's and the defendant's credibility." (*Falsetta, supra*, at p. 911.) "[T]he Legislature's principal justification for adopting section 1108 was a practical one: By their very nature, sex crimes are usually committed in seclusion without third party witnesses or substantial corroborating evidence. The ensuing trial often presents conflicting versions of the event and requires the trier of fact to make difficult credibility determinations. Section 1108 provides the trier of fact in a sex offense case the opportunity to learn of the defendant's possible disposition to commit sex crimes." (*Falsetta, supra*, at p. 915.)

In determining whether to admit Evidence Code section 1108 propensity evidence, trial courts "must engage in a careful weighing process under section 352" of the Evidence Code by "consider[ing] such factors as its nature, relevance, and possible remoteness, the degree of certainty of its commission and the likelihood of confusing, misleading, or distracting the jurors from their main inquiry, its similarity to the charged offense, its likely prejudicial impact on the jurors, the burden on the defendant in defending against the uncharged offense, and the availability of less prejudicial alternatives to its outright admission, such as admitting some but not all of the defendant's other sex offenses, or excluding irrelevant though inflammatory details surrounding the offense." (*People v. Falsetta, supra*, at p. 917 [Evidence Code section 1108 does not violate due process principles and, thus, is constitutionally valid, because it subjects evidence of uncharged sexual misconduct to the weighing process of Evidence Code section 352 in

19

sex crime prosecutions].) The court's ruling under section 1108 is subject to review for abuse of discretion. (*People v. Loy* (2011) 52 Cal.4th 46, 61.)

Initially, defendant contends and the People concede that the prosecutor failed to timely disclose the three prior victims as witnesses. Under Evidence Code section 1054.7, witness disclosures shall be made 30 days before trial. If a party fails to comply with its discovery obligations, a trial court may issue any order necessary to enforce the discovery statutes, including, but not limited to "delaying or prohibiting the testimony of a witness or the presentation of real evidence [or] continuance of the matter." (Evid. Code, § 1054.5, subd. (b).) The court, however, may not prohibit the testimony of a witness unless "all other sanctions have been exhausted." (Evid. Code, § 1054.5, subd. (c).) Here, the prosecution disclosed the probation report from defendant's prior convictions on February 19 and included a request to admit evidence regarding the prior convictions in its February 26 trial brief. Jury selection commenced on March 8 and the court ruled on the admissibility of the evidence on March 11. The witnesses testified on March 29. Although defendant objected to the timeliness of the request in written opposition filed on March 5, he indicated that he was not seeking a continuance of the trial, as such would interfere with his right to a speedy trial, and argued the proper remedy was exclusion of the witnesses' testimony. At no point, however, has defendant explained how he was prejudiced by the delayed disclosure of the Evidence Code section 1108 evidence. In fact, the witnesses did not testify until well after the trial had commenced. The trial court did not abuse its discretion in impliedly rejecting defendant's request to exclude the testimony because of a delay in discovery.

Nor did the trial court abuse its discretion in admitting the witnesses' testimony. There is no dispute that the prior offenses qualified as sexual

offenses within the meaning of Evidence Code section 1108. The court reasonably concluded that the probative value of the prior offenses outweighed the potential prejudice under Evidence Code section 352. Noting that this was a "a difficult, difficult call" with "similarities and dissimilarities," the trial court found the sexual offenses similar in that they involved digital penetration with significant pain and bleeding and in both the prior and current offenses, defendant ignored the victims when they told him to stop. The court found that due to these similarities, the evidence was probative of the issue of consent in the present case. The court reasonably concluded that the propensity evidence would not confuse or distract the jurors from their main inquiry. Defendant pled guilty to three counts of continuous sexual abuse of a minor (§ 288.5) and although he was not convicted of the underlying forcible sexual acts to which the prior victims testified, there is nonetheless certainty that the acts were committed, if not forcefully. Having been convicted and served time in prison, there is little likelihood the jury would wrongly convict him in the present case in retribution for the prior offenses. The presentation of the evidence did not result in undue consumption of time. The victims' testimony combined spans only 30 pages in the transcript. While the convictions are arguably remote, defendant was in custody for almost all of the intervening time and re-offended shortly after his parole. Finally, the trial court noted that while the age of the prior victims is something the jury might consider, the testimony did not rise to the level of inflammatory when compared to the acts on trial. Recognizing that this is a close case, we cannot say that the trial court abused its discretion in admitting the evidence.

*4. Defendant's illegal conduct came within the meaning of section 266e.*

Under section 266e, "Every person who purchases, or pays any money or other valuable thing for, any person for the purpose of prostitution as defined in subdivision (b) of Section 647, . . . is guilty of a felony punishable by imprisonment in the state prison for 16 months, or two or three years." Section 647 states in relevant part that " 'prostitution' includes any lewd act between persons for money or other consideration." (§ 647, subd. (b)(4).) The jury was instructed, "To prove that the defendant is guilty of acquiring a person for the purpose of prostitution the People must prove that: [¶] 1.) The defendant purchased or paid any money or other valuable thing for a person; and [¶] 2.) The defendant did so for the purpose of prostitution . . . ."

Defendant contends that he could not be found guilty of violating section 266e because, under the prosecution's theory, Jane Doe was not a prostitute. He argues, "On its face section 266e contemplates two separate and distinct acts of payment. The first act involves the statutory element of 'purchases, or pays any money or other valuable thing for any person.' The second act, which is necessarily part of the definition of 'prostitution' as defined in . . . section 647, subdivision(b)(4), includes 'any lewd act between persons for money or other consideration.' While this second act which is necessary for prostitution is not an element of [section] 266e, the intent to commit an act of prostitution – a lewd act between persons for money – is an essential element. It is this element, which necessarily includes a 'prostitute' who is acting for money, that is omitted by the People's and court's construction of section 266e." (Italics omitted.)

Contrary to defendant's argument, whether Jane Doe was actually a prostitute or engaged in acts of prostitution is irrelevant to defendant's violation of section 266e. The relevant inquiry is as to defendant's intent in

making the payment. In *People v. Lewis* (1904) 141 Cal. 543, 545 the court held, under former section 267, which made it unlawful to take away a female under the age of 18 years from a person having the legal charge of her person "for the purpose of prostitution, that "the actual placing in a house of prostitution is not made an essential element of the crime by the statute. It is the taking from the parent or other person having the legal charge of her person, for the prohibited purpose, that constitutes this crime." The court added, " 'The gravamen of the offense is the purpose or intent with which the enticing and abduction is done, and the offense is complete whenever the abduction for the prohibited purpose is complete, no matter whether any sexual intercourse result or not.' " (*Ibid.*) Here, Jane Doe's testimony established that defendant paid Feack for her and defendant's witnesses established that he intended the payment to be for purposes of prostitution. When Jane Doe clarified that she was not a prostitute, he indicated that he did not care and sexually assaulted her. The crime was complete once the first payment was made to Feack.

5. *Any instructional error regarding the use of propensity evidence to prove defendant's violation of section 266e was harmless.*

Defendant contends the jury was incorrectly instructed that it could use his prior convictions, admitted under Evidence Code section 1108, to help prove he was guilty of acquiring a prostitute in violation of section 266e. As defendant notes, the use of his prior convictions in this manner would not have been permissible because section 266e is not a sexual offense under Evidence Code section 1108, subdivision (d).

"We independently review whether the trial court accurately instructed the jury. [Citation.] We review the allegedly erroneous instruction in the context of the evidence presented at trial. [Citations.] We review the instructions as a whole [citation], with the assumption that jurors are

23

'capable of understanding and correlating' all of the instructions given [citation]. [¶] . . . Our duty is to determine 'whether there is a reasonable likelihood that the jury misunderstood and misapplied the [allegedly erroneous] instruction.' " (*People v. Martinez* (2019) 34 Cal.App.5th 721, 728.)

The jury was given two instructions regarding the use of propensity evidence. First, with respect to the use of defendant's prior convictions as propensity evidence, the jury was instructed in relevant part, "The People presented evidence that the defendant committed the crimes of continuous sexual abuse of a child, Doe C; continuous sexual abuse of a child, Doe V; and continuous sexual abuse of a child, Doe M that were not charged in this case. . . . [¶] . . . [¶] If you decide that the defendant committed the uncharged offenses, you may, but are not required to, conclude from that evidence that the defendant was disposed or inclined to commit sexual offenses, and based on that decision, also conclude that the defendant was likely to commit and did commit rape and/or penetration with a foreign object as charged here." (CALCRIM No. 1191A.) The jury was instructed regarding the use of the charged offenses as propensity evidence as follows: "The People presented evidence that the defendant committed the crimes of rape and penetration with a foreign object charged in counts one and two. [¶] If the People have proved beyond a reasonable doubt that the defendant committed one or more of *these crimes*, you may, but are not required to, conclude from that evidence that the defendant was disposed or inclined to commit sexual offenses, and based on that decision, also conclude that the defendant was likely to commit and did commit *the other sex offenses charged in this case*." (CALCRIM No. 1191B.) (Italics added.) The jury was not instructed that a violation of section 266e is not a sex offense.

24

Defendant contends that based on the above instructions, the jury could use his prior convictions to find he committed the charged rape and/or sexual penetration and then use his guilt as to the charged rape and/or sexual penetration to conclude he committed the charged section 266e offense. He argues that absent a clarifying instruction, the jury would necessarily have understood the violation of section 266e, and the lesser included offense of soliciting another person to engage in an act of prostitution in violation of section 647, subdivision (b),[6] to be "the other sex offenses charged in this case."

The Attorney General agrees that "some of the wording of CALCRIM No. 1191B, as given in this matter . . . is somewhat vague and not the model of clarity," but argues that it is not likely that the jury believed it could use defendant's guilt for the crimes of rape and penetration with a foreign object as propensity evidence to help prove that he was also guilty of a violation of section 266e. We disagree with the Attorney General's argument. Indeed, the most reasonable interpretation of "the other sex offenses charged in this case" is that the instruction refers to crimes charged under count 3. While neither of the crimes charged under count 3 are sex offenses within the meaning of Evidence Code section 1108, given their references to prostitution, a reasonable jury would likely characterize them as sex offenses. The reference in the instruction to "*other* charged sex offenses" confirms that understanding.

The error, however, was harmless. (*People v. Watson* (1956) 46 Cal.2d 818, 836.) Defendant admitted the necessary elements of the offense. Defendant did not dispute that he paid a total of $100 for the purpose of

___

[6] A violation of section 647 is also not an enumerated sex offense under Evidence Code section 1108, subdivision (d).

25

prostitution. It is also undisputed that he directly paid Feack $40 at a minimum for bringing Jane Doe to his home. While Feack characterized the $40 payment as "gas money" it was, nonetheless, a payment intended to secure a person for purposes of prostitution.

6. *The prosecution did not commit Trombetta/Youngblood[7] error by failing to obtain Jane Doe's phone.*

As part of the investigation in this matter, the police seized defendant's cell phone and the data obtained from the phone was disclosed to the defense. The court denied, however, defendant's motion to compel discovery of Jane Doe's cell phone and related data and records. The trial court explained, "what defense is requesting here is that the court order prosecution to seize a person unsuspected of a crime's phone and do a digital dump and then turn that over. I -- that is beyond discovery."

At trial, defense counsel argued that because the police did not obtain the data from Jane Doe's phone, it was difficult to get a full understanding of what happened between defendant and Jane Doe. He suggested, "if the law enforcement had simply asked for [her phone] and had been able to extract [the data], . . . we would have been able to show that Jane Doe had an independent communication with Mr. Flowers for the transaction, an exchange of money for sex." Defense counsel explained that it was "infuriating" that he was unable to subpoena the phone and its data without cooperation of law enforcement.

---

[7] *California v. Trombetta* (1984) 467 U.S. 479, 489 (*Trombetta*) and *Arizona v. Youngblood* (1988) 488 U.S. 51, 57 (*Youngblood*) collectively recognize that law enforcement agents have a constitutional duty to preserve evidence that might be expected to play a significant role in a suspect's defense.

After his conviction, defendant filed a new trial motion in which he reasserted his contention that the prosecution's failure to seize and search Jane Doe's cell phone violated his due process rights. The court denied the motion and defendant now challenges the denial. He contends his conviction must be reversed because law enforcement failed to collect and preserve Jane Doe's cell phone, which they knew contained "material exculpatory evidence (defendant's cellphone number) and may reasonably have contained additional exculpatory evidence—i.e., the alleged victim may be a prostitute who consented to the sex acts." We review the trial court's factual determinations regarding the potential exculpatory value of the evidence under the substantial evidence standard of review by "viewing the evidence in the light most favorable to the superior court's finding." (*People v. Roybal* (1998) 19 Cal.4th 481, 510.) Whether the police had a constitutional duty to gather the potentially exculpatory evidence we review independently. (See *People v. Uribe* (2008) 162 Cal.App.4th 1457, 1473 & fn. 19.)

The Attorney General points out that, without dispute, the phone was never in the possession of the police, and contends the police had no obligation to obtain the phone, with or without Jane Doe's consent. We agree. Although the United States Supreme Court held in *Trombetta* and *Youngblood* that the failure to preserve evidence can violate due process under some circumstances, it has not held that due process requires the collection of evidence. (*People v. Frye* (1998) 18 Cal.4th 894, 942–943, overruled on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.) Likewise, although the California Supreme Court "has suggested that there might be cases in which the failure to collect or obtain evidence would justify sanctions against the prosecution at trial, [the court has] continued to recognize that, as a general matter, due process does not require the police to

collect particular items of evidence." (*People v. Frye*, *supra*, 18 Cal.4th at p. 943; see also *People v. Montes* (2014) 58 Cal.4th 809, 837 [reiterating that "[g]enerally, due process does not require the police to collect particular items of evidence"]; see also *People v. Hogan* (1982) 31 Cal.3d 815, 851 ["police cannot be expected to 'gather up everything which might eventually prove useful to the defense' "] disapproved on different ground in *People v. Cooper* (1991) 53 Cal.3d 771, 836, 809.) Defendant has cited no case to the contrary.

Even if *Trombetta* and *Youngblood's* reasoning could be extended to include collection of evidence, it would be the defendant's burden to demonstrate that the evidence would have been exculpatory and that the failure of investigators to collect the evidence was in bad faith. (*People v. Frye, supra*, 18 Cal.4th at pp. 943–944; *People v. Montes, supra*, 58 Cal.4th at pp. 835–838.) Here, as the prosecutor argued, insofar as defendant was seeking to discover communications between Jane Doe and defendant, "the communications of back and forth, both the receiving and the sent communications, would likely be contained within the extraction from [defendant's] phone." Defendant had access to that information without seizure of Jane Doe's phone. To the extent that defendant was seeking communications between Jane Doe and others that might reveal whether Jane Doe was a prostitute, his argument is entirely speculative.

7. *There is no cumulative prejudice.*

Defendant contends that the errors discussed above collectively resulted in cumulative prejudice that requires reversal of all convictions. However, we have concluded there was only a single instructional error that was not prejudicial. There were no other errors to cumulate and defendant is not entitled to relief. (See *In re Reno* (2012) 55 Cal.4th 428, 483 [without a

28

showing of legal error, no relief on cumulative error, as "there was no error to cumulate"].)

8. *Defendant's sentence must be corrected.*

The trial court imposed prison terms of 75 years to life on counts 1 and 2 based on defendant's admission to the section 667.71 and three-strike sentence enhancement allegations.[8] The court ordered the terms to run consecutively because "these are separate events, sexual events, and . . . a consecutive term is appropriate in those circumstances." On count 3, the court sentenced defendant to a term of 25 years to life, which was stayed pursuant to section 654. Finally the court imposed two consecutive, five-year terms under section 667, subdivision (a).

Defendant contends that the two 5-year terms imposed under section 667, subdivision (a) must be stricken because no section 667, subdivision (a) enhancements were pled in the first amended complaint. The Attorney General agrees. Accordingly, we shall strike the two 5-year terms.

Defendant also contends that the sentences imposed on counts 1 and 2 should be vacated and the matter remanded for resentencing because the trial court misstated the consequences of his admissions to the three-strike enhancement allegations. As to the three-strike enhancement allegations, the court advised defendant before he admitted the allegations that if the allegations were found true, that "would make your conviction for either of the felonies in this particular matter susceptible to a term of 25 years to life in state prison." The court never advised defendant that his three strikes law

---

[8] As relevant here, section 667.71 required that defendant be sentenced to terms of 25 years to life on his convictions for rape and sexual penetration. Under the three strikes law, section 667, subdivisions (b)-(i), those terms were tripled. In *People v. Murphy* (2001) 25 Cal.4th 136, 154, the court held that sentencing under both the three strikes law and section 667.71 is proper.

admissions would triple the 25-year-to-life term as required by section 667.71. The Attorney General concedes that the court misstated the consequences of those admissions but argues that "a fair reading of the record reveals that appellant's admissions were still made knowingly and voluntarily."

In *In re Yurko* (1974) 10 Cal.3d 857, 864, the court held, "as a judicially declared rule of criminal procedure," that an accused, before admitting a prior conviction allegation, must be advised of "the precise increase" in the prison term that might be imposed, the effect on parole eligibility, and the possibility of being adjudged an habitual criminal. "The failure to so advise an accused in the enumerated instances will constitute error which, if prejudice appears, will require the setting aside of a finding of the truth of an allegation of prior convictions." (*Ibid*.) In *People v. Cross* (2015) 61 Cal.4th 164, 171, the court confirmed that failure to advise a defendant as to the penal consequences of this admission to a prior conviction is not reversible error per se. Rather, "the test for reversal is whether 'the record affirmatively shows that [the guilty plea] is voluntary and intelligent under the totality of the circumstances.' " (*Ibid*.)

In *People v. Wrice* (1995) 38 Cal.App.4th 767, 770–771, the court noted that "unlike the admonition required for a waiver of constitutional rights, advisement of the penal consequences of admitting a prior conviction is not constitutionally mandated. Rather, it is a judicially declared rule of criminal procedure. [Citations.] Consequently, when the only error is a failure to advise of the penal consequences, the error is waived if not raised at or before sentencing." (See also *People v. Walker* (1991) 54 Cal.3d 1013, 1023 [when the only error is a failure to advise of the consequences of the plea, "[u]pon a timely objection, the sentencing court must determine whether the error

prejudiced the defendant, i.e., whether it is 'reasonably probable' the defendant would not have pleaded guilty if properly advised"], overruled on different point in *People v. Villalobos* (2012) 54 Cal.4th 177, 183; *People v. Villalobos, supra,* at p. 182 ["we have held that because 'advisement as to the consequences of a plea is not constitutionally mandated,' 'the error is waived absent a timely objection' "].)

In this case, defendant has forfeited his claim because he did not raise it at or before sentencing. The record establishes that defendant was aware of the consequences of his plea in advance of his sentencing but failed to object. The probation department recommended two 75-year-to-life terms and cited the relevant statutory authority. Defendant refused to participate in the proceedings after his conviction, insisting that that he has "no criminal liability for this matter." As the court observed in *Wrice*, "[h]ad the imposition of sentence on the enhancement allegations 'come as a genuine surprise, it would have been a simple matter to bring the issue to the attention of the trial court.' " (*People v. Wrice, supra,* 38 Cal.App.4th at p. 771.)

Even had defendant not forfeited his claim, the record is clear that the error did not prejudice him. There is no reasonable probability that defendant would not have admitted the truth of his prior convictions if the court had correctly advised him of the penal consequences. (*People* v. *Wrice, supra,* 38 Cal.App.4th at p. 771 [" 'Upon a timely objection, the *sentencing court* must determine whether the error prejudiced the defendant, i.e., whether it is "reasonably probable" the defendant would not have pleaded guilty if properly advised.' "].) Defendant was aware before his trial began that he faced the possibility of a de facto life term in prison. Notice that the term would be 150 years to life rather than 50 years to life was not likely to have impacted his decision to admit the three strike enhancement allegations. His

contention that the record does not show his admissions were voluntary and intelligent is thus without merit. Moreover, defendant makes no suggestion that the convictions to which he admitted could not have been readily established in the absence of his admission.

## Disposition

The two 5-year terms imposed under section 667, subdivision (a) are stricken. The judgment is affirmed in all other respects.

POLLAK, P. J.

WE CONCUR:

STREETER, J.
BROWN, J.